571 F.2d 1190
 187 U.S.App.D.C. 241
 The CHESAPEAKE AND OHIO RAILWAY COMPANY and the Baltimore
and Ohio Railroad Co., Petitioners,
v.
The UNITED STATES of America and The Interstate Commerce
Commission, Respondents,
Railway Labor Executives' Association and the Brotherhood of
Railway and Airlines Clerks, Intervenor.
 No. 75-2110.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Dec. 2, 1976.
Decided Oct. 19, 1977.
Rehearing Denied Nov. 22, 1977.
 
 Edward K. Wheeler, Washington, D. C., with whom Robert G. Seaks, Washington, D. C., was on the brief, for petitioners.
 Raymond Michael Ripple, Atty., I. C. C., Washington, D. C., with whom Arthur J. Cerra, Gen. Counsel, I. C. C. and Barry Grossman, Atty., Dept. of Justice, Washington, D. C., were on the brief, for respondents. John H. D. Wigger and John J. Powers, III, Attys., Dept. of Justice, Washington, D. C., also entered an appearance for respondent United States of America.
 William G. Mahoney, Washington, D. C., with whom John O'B. Clarke Jr., Washington, D. C., was on the brief for intervenors.
 Before BAZELON, Chief Judge, and LEVENTHAL and MacKINNON, Circuit Judges.
 Opinion for Court filed by LEVENTHAL, Circuit Judge.
 Dissenting Opinion filed by MacKINNON, Circuit Judge.
 LEVENTHAL, Circuit Judge:
 
 
 1
 In 1974 the United Transportation Union petitioned the Interstate Commerce Commission pursuant to § 5(9) of the Interstate Commerce Act[1] to reopen the proceeding which had previously culminated in an order of December 31, 1962, 317 I.C.C. 261, by which the Commission authorized the Chesapeake & Ohio Railway Company to acquire control of the Baltimore & Ohio Railway Company. At first the Commission denied the petition to reopen. Subsequently after its order was challenged in the three-judge district court for Northern Ohio, the Commission sua sponte reconsidered, and issued an Order on June 20, 1975, in which the Commission clarified its intent in the 1962 order in regard to the provisions imposed on the merger for the protection of employees under § 5(2) (f) of the Act.
 
 
 2
 The petitioners say that this so-called clarification was really a disguised modification of the 1962 order. There is much to be said for the petitioner's view that the 1962 order provided protection only for those employees adversely affected within four years of the Commission's order. That is the language of Articles I and II of Appendix VIII ("Conditions for the benefit of employees of carriers"), 317 I.C.C. at 346, 348-49.[2]
 
 
 3
 On the other hand, the Commission is not without a predicate for the ruling now protested, in the text of the 1962 report preceding the Appendix. While the language of the Appendix is cast in terms of cutting off the protective scheme at the end of four years from the date of the order, the text of its order really an opinion or report indicated that the ICC intended to impose the "New Orleans conditions" (slightly modified to require arbitration).[3] These conditions, as appears below, had the basic characteristic, in effect, of giving protection to the employee for a period calculated from the time of adverse impact (subject to a limit of five years from the date of coordination).
 
 
 4
 In ascertaining the intention of the 1962 order, as incorporating the New Orleans conditions, it is not irrelevant that at that time the C & O-B & O themselves urged the New Orleans conditions.[4] While we do not refer to this in the sense put forward in the government's brief as constituting waiver or estoppel as to the railroads, we think it material as to the legitimacy of the ICC's current effort to ascertain its intent in its 1962 order.
 
 
 5
 The history of conditions protective of employees goes back to the Washington Agreement of May 21, 1936, worked out by the Federal Coordinator of Transportation, pursuant to the Emergency Railroad Transportation Act of 1933.[5] The Washington Agreement protected both those employees immediately affected by the coordination, and those not adversely affected until later, by providing that as to the latter, protection would begin as of the time of the adverse effect, and would continue for a total period not exceeding five years from the effective date of the coordination.
 
 
 6
 Subsequent to the lapse of the 1933 Act, the enactment in 1940 of § 5(2)(f) required that in all merger cases the Commission "require a fair and equitable arrangement to protect the interests of the railroad employees affected." The second sentence provided that this arrangement must accord full financial protection for four years from the effective date of the order if an affected employee had been employed for four years. At first the ICC considered this the maximum protection authorized. Accordingly, the Commission devised the so-called Oklahoma conditions,[6] which afforded protection only to those employees affected within the first four years after the effective date of the Commission's order. The Supreme Court held, however, that this was a minimum protection and remanded for further consideration by the Commission.[7]
 
 
 7
 On remand, the Commission determined that the protection of the Oklahoma conditions four years from the effective date of the order would not be sufficient to discharge its duty to provide fair and equitable conditions. Consequently, it established what are now normally called the New Orleans conditions,[8] which incorporated by reference both the Washington Agreement and the Oklahoma conditions.
 
 
 8
 With the order now before us the Commission, in establishing the conditions set by its New Orleans, order, reaffirmed and applied the reasoning of that order. The Commission perceived that the protection of the Oklahoma conditions was inadequate to provide a fair and equitable arrangement, and so determined that, in addition, employees should be protected from the time they are adversely affected (subject to a maximum of five years from the effective date of coordination), as was true under the Washington Agreement.[9]
 
 
 9
 Petitioners say it is obvious that the language in the 1962 Appendix only provides the Oklahoma protection four years from the date of the order. But the same language which is before us today was used by the Commission in its 1962 Southern-Central of Georgia case.[10] That order came to the Commission for clarification, on remand by the Supreme Court.[11] It was another issue that had been brought to the Supreme Court, but when the Commission came to take a full look at the situation, as it had both the occasion and authority to do on the remand,[12] the Commission stated that its intent in the Southern-Central of Georgia conditions was to impose the New Orleans conditions with only one modification, a compulsory arbitration procedure. Southern Railway Control Central of Georgia Railway, 331 I.C.C. 151, 164 (1967).
 
 
 10
 The Supreme Court's remand to the agency did not require the agency to limit itself to the issue previously before the Court, but gave the agency authority to clarify its intention and make revisions in any respect that was within its statutory authority.[13]
 
 
 11
 In sum, while petitioners stress the language of the 1962 Appendix, the construction now stated by the Commission is supported by (a) its 1962 opinion, accompanying that Appendix, which set forth its approach (the New Orleans conditions); (b) the fact that the approach was accepted by both C&O-B&O and the unions; and (c) the fact that its construction of identical language in a contemporaneous 1962 order, as embodying the New Orleans conditions, was made clear in a 1967 action, when its intentions and recollections were fresh, and before any contrary possibilities could have frozen.
 
 
 12
 The action of the Commission was hardly tidy. We have had occasion to be concerned previously regarding ICC clarifications and interpretations that are really substantial changes, and we agree with petitioners that the courts are not to rubber stamp the label put on this matter by the Commission.[14] But while we are not entirely comfortable with the record before us, we think that on balance we must say that the Commission has not acted beyond the range of its authority. We find a basis for the ICC's actions in the discernment of an ambiguity that needed clarification.
 
 
 13
 Receipt of the dissenting opinion's extended presentation of the wording of the 1962 Appendix, and the contrast with language used in other orders, prompts us to acknowledge that if all we had before us were the language of the Appendix there would indeed be a strong case for the petitioners. But even in the construction of statutes, the "plain meaning rule" is only a primary source of understanding, not conclusive, and it must yield on occasion to an intention otherwise discerned in terms of equity, legislative history, or other sources.
 
 
 14
 Here the "plain meaning" of the words in the Appendix is different from the "plain meaning" of the order setting forth the Commission's contention. We have no clue as to why the wording in the Appendix was not conformed at the time perhaps ineptitude; perhaps lack of concern on a point where the carriers were not in disagreement; perhaps laziness in using the handy language of the statute, without insertion to carry forward the manifested intention to provide more than the minimal statutory protection; perhaps a combination of these. In any event, we find the kind of ambiguity in the ICC 1962 action that provided a basis for the current clarification.
 
 
 15
 In the last analysis, our result is dictated by our function. Our task is not the same as that of a court that construes a contract between parties, with freedom to decide for itself what is the proper construction without any deference to other sources. Here the pertinent doctrine bids us sustain the agency's interpretation of its own order unless it is arbitrary or capricious. As we said before, the ICC's handling of this issue was not tidy, but it was not arbitrary or capricious.
 
 
 16
 Affirmed.
 
 MacKINNON, Circuit Judge, dissenting:
 
 17
 On December 17, 1962, in approving the application of the Chesapeake and Ohio Railroad Company (C & O) to acquire stock control of the Baltimore and Ohio Railroad Company (B & O),[1] the Interstate Commerce Commission (ICC) imposed conditions to protect the interests of the employees of the railroads from adverse effects resulting from the acquisition of such control.
 
 I. THE APPLICABLE STATUTE
 
 18
 In imposing these protective conditions, the Commission acted pursuant to section 5(2)(f) of the Interstate Commerce Act, which provides:
 
 
 19
 As a condition of its approval, under this paragraph, of any transaction involving a carrier or carriers by railroad subject to the provisions of this chapter, the Commission shall require a fair and equitable arrangement to protect the interests of the railroad employees affected. In its order of approval the Commission shall include terms and conditions providing that during the period of four years from the effective date of such order such transaction will not result in employees of the carrier or carriers by railroad affected by such order being in a worse position with respect to their employment, except that the protection afforded to any employee pursuant to this sentence shall not be required to continue for a longer period, following the effective date of such order, than the period during which such employee was in the employ of such carrier or carriers prior to the effective date of such order. Notwithstanding any other provisions of this Chapter and Chapters 8 and 12 of this title, an agreement pertaining to the protection of the interests of said employees may hereafter be entered into by any carrier or carriers by railroad and the duly authorized representative or representatives of its or their employees.
 
 
 20
 49 U.S.C. § 5(2)(f) (1970) (emphasis added).
 
 
 21
 The ICC now contends that it had the right, over eleven years after its 1962 opinion was filed, to clarify its 1962 opinion.
 
 
 22
 II. THE POSITION OF THE INTERSTATE COMMERCE COMMISSION
 
 
 23
 The ICC's present position is that it was the intent of the Commission in the 1962 order to extend protection to a railroad employee beginning at any indefinite date in the future whenever he is "first adversely affected" by the particular approved transaction, notwithstanding irreconcilable language in the original order. The Commission's reasoning is set forth in its opinion in this case decided June 10, 1975:
 
 
 24
 In imposing the New Orleans conditions, the Commission, as has long been recognized, in effect extends the period of protection beyond the basic four years provided by section 5(2)(f) and the so-called "Oklahoma conditions." See New Orleans Union Passenger Terminal Case, 282 I.C.C. 271 (,) 275, 281-282 (1952). This is achieved through incorporation of the New Orleans conditions of the Washington Job Agreement[2] of 1936 which protects an employee from the time he is first adversely affected. See section 6(a) of the Washington Agreement which provides as follows:
 
 
 25
 No employee of any of the carriers involved in a particular coordination who is continued in service shall, for a period not exceeding five years following the effective date of such coordination, be placed, as a result of such coordination in a worse position with respect to compensation and rules governing working conditions than he occupied at the time of such coordination so long as he is unable in the normal exercise of his seniority rights under existing agreements, rules and practices to obtain a position producing compensation equal to or exceeding the compensation of the position held by him at the time of the particular coordination, except however, that if he fails to exercise his seniority rights to secure another available position, which does not require a change in residence, to which he is entitled under the working agreement and which carries a rate of pay and compensation exceeding those of the position which he elects to retain, he shall thereafter be treated for the purposes of this section as occupying the position which he elects to decline.
 
 
 26
 It should be noted that coordination is defined at section 2(a) as follows:
 
 
 27
 The term "coordination" as used herein means joint action by two or more carriers whereby they unify, consolidate, merge or pool in whole or in part their separate railroad facilities or any of the operations or services previously performed by them through such separate facilities.
 
 
 28
 Consequently, when an employee is first adversely affected as a result of the approved transaction after four years from the effective date of the Commission's order, that employee is entitled to protection from the time of the adverse effect. Any other conclusion, as has been shown, would be contrary to our original report in this matter and to the interpretation given to the identical protective conditions in the Southern control case.
 
 
 29
 Chesapeake & Ohio Ry. Co. Control Baltimore & Ohio R. Co., ---I.C.C. ---(June 10, 1975) (J.A. 59-60) (emphasis added).
 
 
 30
 Therefore, the issue before this court is whether the Commission acted properly when in 1975, on its own motion, it reopened the 1962 decision by claiming a right to "clarify" the labor protective conditions imposed in 1962. The associated issue is whether the Commission's order was a clarification.
 
 
 31
 III. THE HISTORY OF SECTION 5(2)(f) OF THE INTERSTATE COMMERCE ACT
 
 
 32
 In order to appreciate fully the context in which this case comes before this court, one needs to review certain aspects of the history of section 5(2)(f) and of this litigation. The history of section 5(2)(f) was reviewed at length in Railway Labor Executives' Association v. United States, 339 U.S. 142, 70 S.Ct. 530, 94 L.Ed. 721 (1950), which held in 1950 that under the statute, the four-year protective period was a minimum (as required by the second sentence of the statute) and not the maximum protective period that the Commission (pursuant to the first sentence of the statute) could impose. 339 U.S. at 155, 70 S.Ct. 530; Norfolk & Western Ry. Co. v. Nemitz, 404 U.S. 37, 42, 92 S.Ct. 185, 30 L.Ed.2d 198 (1971).
 
 
 33
 Prior to the Supreme Court's decision in Railway Labor Executives' Association, the Commission believed it did not possess authority under section 5(2)(f) to prescribe protective provisions for any period greater than four years. This belief was epitomized in Oklahoma Railway Co. Trustees Abandonment, 257 I.C.C. 177, 197-201 (1944), where the Commission imposed a four-year protective period extending "from the date on which the employee was displaced to the expiration of 4 years from the effective date of our order herein. . . ." 257 I.C.C. at 198. Accord, New Orleans Union Passenger Terminal Case, 267 I.C.C. 763 (1948). Following the Supreme Court's 1950 holding that the second sentence of section 5(2)(f) prescribed a minimum period of protection, the Commission subsequently devised the so-called New Orleans conditions, New Orleans Union Passenger Terminal Case, 282 I.C.C. 271 (1952), which the ICC states is the principal support for its action in this case.
 
 
 34
 The protective conditions imposed by the Commission in New Orleans provided:
 
 
 35
 (W)e find that a fair and equitable arrangement for protecting the interests of the employees adversely affected by the transaction herein will be provided by applying the terms of the Washington agreement of May 21, 1936, subject to the following limitations or restrictions:
 
 
 36
 (a ) That employees adversely affected within 4 years from the effective date of the order approving the transaction shall receive as a minimum the protection afforded by conditions 4 to 9, inclusive, in Oklahoma Ry. Co. Trustees Abandonment, 257 I.C.C. 177 (197-201), as prescribed in the report and order approving the transaction, for the period they are adversely affected prior to May 17, 1952 (4 years from the effective date of the order of approval ), and any such employee so adversely affected who has received under such conditions total dismissal or displacement compensation less than that which he would receive by applying the Washington agreement, as limited, for the full protective period therein provided from the time he is first adversely affected, shall continue to receive benefits under the terms of the Washington agreement, as limited, until the total compensatory benefits provided therein for his particular period of service have been paid.
 
 
 37
 282 I.C.C. at 281-82 (emphasis added). The intent of the Commission in the foregoing was discussed in a subsequent paragraph of its decision:
 
 
 38
 The intent and effect of the foregoing findings are that all employees adversely affected by the transaction involved should receive the protection afforded by the Washington agreement, reduced as to dismissed employees to the extent that they receive compensation in other employment or under unemployment insurance laws; and that employees adversely affected prior to May 17, 1952 (4 years from the effective date of the order of approval ) are to receive as a minimum the protection afforded by the Oklahoma conditions as prescribed in the previous report for the period they are adversely affected prior to May 17, 1952, but if the total amount of such compensation is less than they would receive under the Washington agreement, as limited, applied from the date of the adverse effect, then they are entitled to the remaining benefits they would have enjoyed under the latter.
 
 
 39
 282 I.C.C. at 282. In short, because the transaction approved in that case required several years for completion, and because it would be several years until its principal effect would take place, the Commission was concerned that some employees might need protection after the expiration of the first four-year period. In its order, the Commission required that all employees be protected by the terms of the Washington Agreement, as limited.[3] However, this did not mean that any employee would be entitled to protection indefinitely.[4] The Washington Agreement in section 6(a) limited the protective period for employees "continued in service" to a "period not exceeding five years following the effective date of (the) coordination." (Emphasis added.) In its order, the Commission also required that employees affected during the first four years from the effective date of the Commission order would receive the protection of the Oklahoma conditions, but if this protection was less than that afforded by the Washington Agreement, the employee would receive remaining benefits under the Washington Agreement.[5]
 
 
 40
 IV. THE COMMISSION'S ORIGINAL ORDER IN THIS CASE
 
 
 41
 In 1962, in approving the C & O's acquisition of control of the B & O in the present case, the Commission discussed the relevant facts and then in a separate Appendix VIII precisely articulated the "(c)onditions for the benefit of employees of carriers." Included therein were the following:
 
 
 42
 "Protective period" means that period of time from the date on which an employee is displaced or dismissed to the expiration of 4 years from the effective date of the order authorizing the transaction; provided, however, that the protective period for any particular employee shall not continue for a longer period following the effective date of said order than the period during which such employee was in the employ of the carrier prior to the effective date of the order.
 
 
 43
 Article I, paragraph 1(e), 317 I.C.C. at 346 (emphasis added). The conditions further provided in Article II of Appendix VIII:
 
 
 44
 1. Any employee adversely affected as a result of the transaction, within 4 years from the effective date of the order approving the transaction, shall receive as a minimum the protection afforded by Article I hereof for the period he is adversely affected prior to the expiration of 4 years from the effective date of the order of approval, and any such employee so adversely affected who has received under such conditions total dismissal or displacement compensation less than that which he would receive by applying the Washington Agreement of May 21, 1936, as limited by paragraph 2 of this article, for the full protective period therein provided from the time he is first adversely affected, shall continue to receive benefits under the terms of the Washington Agreement, as limited, until the total compensatory benefits provided therein for the particular period of service have been paid.
 
 
 45
 2. In applying the Washington Agreement the coordination allowance provided therein for dismissed employees shall be reduced with respect to any employee who is otherwise employed to the extent that his combined monthly earnings in such other employment, any benefits received under any unemployment insurance law, and his coordination allowance, exceed the amount upon which his coordination allowance is based; such employee or his representative, and the carriers, to agree upon a procedure by which the carriers shall be currently informed of the wages earned by such employee in employment other than with the carriers, and the benefits received.
 
 
 46
 Article II, 317 I.C.C. at 348-49 (emphasis added).
 
 
 47
 It should be noted that the Commission made the above statement in 1962, long after the Supreme Court in its 1950 decision had held that the ICC could provide for a protective period extending beyond four years. In New Orleans, the ICC also knew it could impose a protective period to begin from the time an employee was first adversely affected by a deferred coordination. Knowing this, as above indicated, the Commission in this case nevertheless ordered a protective period limited to "employee(s) adversely affected as a result of the transaction, within 4 years from the effective date of the order" approving the transaction . . . (circa December 17, 1962). Id. (emphasis added). Thus, the protective period of the Washington Agreement, which would have run from the "effective date of the coordination," was not imposed. Instead the Commission ordered the protective period to run from the "effective date of the (ICC) order authorizing the transaction." This is not ambiguous and furnishes no basis for substituting the five-year protective period of the Washington Agreement or any unlimited protective period that would begin at any date in the future, beyond the four-year protective period, whenever an employee claims to be adversely affected.
 
 
 48
 It should also be noted that the reference in the above extract from Article II which assures those adversely affected employees who receive "total dismissal or displacement compensation less than that which he would receive by applying the Washington Agreement of May 21, 1936, as limited by paragraph 2 of this article, for the full protective period therein provided from the time he is adversely affected . . . (etc.)," only applies by the terms of Article II, paragraph 1, to "any such employee so adversely affected . . . within 4 years from the effective date of the (Commission's) order approving the transaction." Id. The Washington Agreement was thus introduced to provide the extent of the benefits for "displacement or dismissal" and not to establish eligibility for benefits for any different period than the four years provided therein.
 
 
 49
 The ICC's 1962 order previously stated: "These conditions are the same as those imposed in the Southern Control case." 317 I.C.C. at 289 (emphasis added). The mention of the Southern Control case referred, inter alia, to the "protective period" imposed by the Commission in Southern Railway Co. Control Central of Georgia Railway Co., 317 I.C.C. 557 (1962). (Southern Control I ).[6] This earlier decision had imposed an identical "protective period" of "four years" and all other "conditions" on the two mergers were identical. The history of Southern Control figures importantly in this appeal.
 
 
 50
 V. THE DECISION IN Railway Labor Executives' Association v. ICC INVOLVING THE Southern Control CASE
 
 
 51
 Following the final ICC order in Southern Control I on June 10, 1963, the Railway Labor Executives' Association charged in a suit brought in the Eastern District of Virginia that the "Conditions for the benefit of employees" in the ICC Southern Control I decision should be set aside and annulled because they "fall short of the minimum requirements of the second sentence of section 5(2)(f) of the Interstate Commerce Act, and lack the 'fairness and equity' provided for in the first sentence of the (section)." Railway Labor Executives' Ass'n. v. United States, 226 F.Supp. 521, 522 (E.D.Va.1964). The complaint failed to make any attack on the four-year protection period, as such.[7] This case had been timely brought after the final ICC action on June 10, 1963, as is indicated by the December 4, 1963 argument date in the United States District Court of Virginia. The prompt decision on January 31, 1964 by a three-judge district court dismissed the complaint. On direct appeal, the Supreme Court vacated the court's judgment insofar as it related to sections 4, 5, and 9 of the Washington Agreement, which were designed for employee protection.[8]
 
 
 52
 The per curiam opinion of the Supreme court in Railway Labor Executives' Association v. United States, 379 U.S. 199, 85 S.Ct. 307, 13 L.Ed.2d 338 (1964), which involved Southern Control I, decreed:
 
 
 53
 The judgment of the District Court is vacated insofar as it relates to §§ 4, 5, and 9 of the Washington (Job Protection) Agreement, and this case is remanded to that court with instructions to remand it to the Interstate Commerce Commission with instructions to amend its reports and orders as necessary to deal with appellants' request that §§ 4, 5, and 9 be included as protective conditions, specifically indicating why each of these provisions is either omitted or included. See United States v. Chicago, M., St. P. & Pac. R. Co., 294 U.S. 499, 511, 55 S.Ct. 462, 79 L.Ed. 1023.
 
 
 54
 379 U.S. at 200, 85 S.Ct. at 308. Plaintiffs did not attack, and the Supreme Court stated no reason to clarify or alter, the duration of the protective period.
 
 
 55
 On remand to the ICC, the Commission, in an opinion filed on November 15, 1967, clarified its prior order by adding that Southern must comply with sections 4, 5, and 9 of the Washington Agreement. Southern Ry. Co. Control Central of Georgia Ry. Co., 331 I.C.C. 151, 187 (1967) (Southern Control II ). The Commission reasoned that "in framing the conditions to be imposed in this proceeding, we relied upon our holding in the New Orleans case that imposition of the provisions of the Washington Agreement, except for specifically rejected sections not relevant here, applied in full." Id. This result was necessary, according to the Commission, to ensure that the minimum requirements of section 5(2)(f) would be complied with in the new situation created by its subsequent order.
 
 
 56
 The Commission went on to note, however, that "compliance now (with sections 4, 5, and 9 of the Washington Agreement) will result in adverse affect (sic) to employees who, to date, have not been affected by the transaction, and requires the imposition of supplemental conditions to protect the interest of such newly affected employees." 331 I.C.C. at 186 (emphasis added).[9] In such event, if the four-year protective period controlled, no adjustment in employee benefits would be necessary because the four-year period prescribed as a condition to the merger in the 1962 ICC decision had expired.[10] To correct this inequity to some employees, the Commission
 
 
 57
 supplemented (its order) to provide to all employees who were employed on, or, by reason of seniority rank, were eligible for employment on, either of the applicant railroads on the date of consummation of the transaction which is the subject of this proceeding, and who have not heretofore been adversely affected by such transaction but who, as the result of the compliance by applicants with the provisions of sections 4 and 5 of the Washington Agreement, are adversely affected by such compliance, the full protections of the Washington Agreement, as specifically modified in the report of November 7, 1962 in respect to the provisions of sections 7(i) and 13 thereof, commencing on the date of execution by the parties of implementing agreements reached as a result of compliance by applicants with the provisions of sections 4 and 5 of the Washington Agreement, subject, however, to the condition that, for purposes of determining the right of claimants hereunder, the term "effective date of the coordination" contained in the Washington Agreement shall be deemed herein to refer to the date of execution of the aforementioned implementing agreement, and not the consummation date of the coordination which is the subject of the instant proceeding.
 
 
 58
 331 I.C.C. at 187 (emphasizing added).
 
 
 59
 This supplementary provision created a new "protective period" in place of the protective conditions provided in the initial order. This new period would run from the date of the agreement implementing seniority and other rights under the Washington Agreement and not from the "consummation date" of the merger as provided in the 1962 order. Such authority to do equity was vested in the Commission by section 5(2)(f) and it is significant that the employment protective period was a set period of four years from the date of a specific agreement and not from the date of any adverse effect over an unlimited period in the future.
 
 
 60
 Thus, because Southern had inequitably preferred its own employees in the reduced operations of the two railroads following the merger, and had not complied with the Washington Agreement, a new protective period was required during which previously benefitted employees who became adversely affected by the new conditions would be entitled to the protective conditions set forth in the prior order with the addition of those in sections 4, 5, and 9 of the Washington Agreement. From this, the respondents in the present case contend that:
 
 
 61
 The Commission's (compelled) reopening (in 1967) to clarify its prior (1962) opinion in "Southern Central of Georgia" and the apparent later uncertainty and controversy as to the meaning of the prior decision provided the rational basis for the reopening.
 
 
 62
 Resp.Br. at 16.
 
 
 63
 The difficulty with respondents' contention, that the clarification of the Southern Control conditions to meet the novel situation that developed there also opens the conditions here to clarification, is that the Commission in this case has never entered any finding of any changed condition in the C & O-B & O affiliation that justifies the imposition of a new protective period. Thus, the decision in Southern Control II, where a new protective period was necessary because Southern had not complied with the prior ICC order (Southern I ) and the new order would cause additional employees to be adversely affected, does not support the respondents' claim that whenever any employee is alleged to be adversely affected by an approved transaction after four years from the effective date of the order, the employee is entitled to protection from the time of the adverse effect. The Commission order here clearly did not so provide. The imposition of the supplemental order in Southern Control II prescribing a new protective period was necessary to guarantee the minimum protection required by section 5(2)(f), which Southern had failed to provide completely during the first protective period. This came about when it did not comply with the Commission's order or its collective bargaining agreement. The second protective period was thus remedial to correct past wrongs. In the instant case, there is no showing that a similar change in the 1962 order is necessary to provide the employees with the required statutory level of protection.[11]
 
 
 64
 VI. Southern Control SUPPLEMENTATION AND CLARIFICATION DISTINGUISHED
 
 
 65
 Respondents, however, also urge that the Commission in 1962 in its C & O-B & O decision actually intended to measure the protective period from the time all employees were first adversely affected and that the Commission should therefore be allowed to impose such conditions through the 1975 order as a clarification of an ambiguity. Resp.Br. at 12-13. Specifically, respondents point to "the import of the 'Southern-Central of Georgia' litigation and the substance of the interpretation in the Commission's Supplemental Report and Order (J.A. 56-57)." Resp.Br. at 12.
 
 
 66
 The facts regarding the Southern Control II decision which clearly distinguish it from this case have been dealt with already. Southern Control II created an additional protective period because Southern had not complied with the original ICC order and had dealt inequitably with many employees following the merger, the correction of which situation would cause new serious effects on previously benefitted employees. The action of the Commission in Southern Control II, however, was never claimed to be a "clarification." That action was supplementary and was so declared; it was designed to ensure that the minimum statutory protection was afforded all employees including those of the Central of Georgia. Thus, the Commission in Southern Control II for its authority relied on its power, found in 49 U.S.C. § 5(9) (1970), to add conditions to provide the employee protection required. 331 I.C.C. at 184. No similar need for supplementation has been demonstrated here and the absence of any record here, of course, leaves the ICC action without any support.
 
 
 67
 Respondents' reference to the "Supplemental Report and Order" points to the June 10, 1975 action in which the Commission sua sponte reversed its prior 1962 decision in this case and "(reopened the) proceeding in order to clarify its prior intent which (conformed) to the relief requested by the Unions in (a pending) court action" (J.A. 56). This reference recites the following statement from the Commission's 1962 opinion on the C & O-B & O affiliation:
 
 
 68
 It is our opinion that the protection afforded by the New Orleans conditions, as modified in the Southern Control case, supra, will more than meet the minimum requirements of section 5(2)(f) . . . . The conditions prescribed in the Southern Control case conform substantially to the New Orleans conditions, with a modification in the provision respecting arbitration of disputes.
 
 
 69
 317 I.C.C. at 288 (emphasis added). This indicates that in 1962, the ICC did not consider the New Orleans conditions in their entirety to be appropriate to the facts of the C & O-B & O merger.[12] Indeed, the Commission should be free in any case that comes before it to devise conditions predicated on its evaluation of the circumstances of the particular transaction, so long as it satisfies the minimum statutory criteria of section 5(2)(f). That the Commission did not choose the New Orleans conditions for this transaction is clear:[13]
 
 
 70
 We find that a fair and equitable arrangement for protecting interests of the employees of the applicant and the B & O and any of their subsidiaries who may be adversely affected as a result of the transaction herein approved will be provided by imposing the conditions set forth in appendix VIII hereof. These conditions are the same as those imposed in the Southern Control case.
 
 
 71
 317 I.C.C. at 289. This indicates in no uncertain terms that the Southern Control I conditions were being imposed, and the prior quoted statement indicated that the New Orleans conditions were modified in Southern Control I. Most significantly, the Commission spelled out the exact conditions in Appendix VIII, 317 I.C.C. 346-49, in the very precise definition of "protective period," which, as described above, limited the conditions imposed by the Commission to "a period of time . . . (expiring) 4 years from the effective date of the order authorizing the (coordination)." 317 I.C.C. at 346. Irrespective of the scope of the New Orleans conditions, the scope of the conditions for this case are clear and unmistakable: the adverse effect must occur within four years after the Commission's order.
 
 
 72
 Indeed, the Commission in its opinion specifically took notice of the union's request that the protective period not be limited to four years from the effective date of the order:
 
 
 73
 Although the association (Railway Labor Executives' Association) urges the imposition of the so-called attrition conditions, it apparently would be willing to accept, as the statutory minimum, the conditions recommended by the hearing examiner, subject to modifications and additions set forth in its exceptions. Specifically, it excepts to the recommended conditions in limiting the protective period to 4 years from the effective date of our order . . . .
 
 
 74
 317 I.C.C. at 286 (emphasis added). This pointed reference to the "protective period (of) 4 years" indicates that by drafting the language in Appendix VIII as it now appears, the Commission in effect rejected the union's exceptions. Now, under the guise of "clarification," the proposed conditions which the I.C.C. specifically rejected in 1962 are sought to be instituted as the actual conditions. This bit of administrative history belies characterizing the Commission's action as a "clarification."The majority also seek to uphold the Commission's 1975 action with the claim that both the railroads and the union agreed that the New Orleans conditions should be imposed. A reading of the 1962 order, however, does not support this conclusion. The hearing examiner recommended employee protection conditions; and the Commission observed that "there is a substantial difference of opinion between the carriers involved and the association as to the conditions which should be imposed." 317 I.C.C. at 286.[14] This denies the agreement that the majority assert.
 
 
 75
 Thus, I would hold that absent some new jurisdictional event, such as a demonstrated failure to comply with the original order, that amounts to "good cause" within the meaning of 49 U.S.C. § 5(9) (1970), the Commission is not authorized by the statute to expand the literal requirements of the 1962 order under the false guise of clarification.[15]
 
 
 76
 To recapitulate, there is nothing ambiguous about the 1962 order in this case which justifies sua sponte clarification. Respondents' reliance on Southern Control II is misplaced. As stated by the Supreme Court,
 
 
 77
 (A) simple but fundamental rule of administrative law . . . is . . . that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action . . . .
 
 
 78
 Securities & Exchange Commission v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947); Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 169, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962).
 
 VII. CLARIFICATION AND LACHES
 
 79
 Finally, even if the 1975 order in this case constituted a mere clarification, the Commission's action was not timely, and this, in my opinion, is an additional sufficient reason to set it aside. Any other result would extend the protective period indefinitely, when it was clearly intended to be limited in duration. Southern Control II can be distinguished even further on this ground. There the Commission took prompt action because the union had acted promptly; it commenced its suit and argued its case within six months of the ICC's June 10, 1963 final order. Here the union was guilty of laches in that its challenge to the adequacy of the protective conditions for the employees of the two involved railroads was not brought with any degree of reasonable promptness. We are not, of course, deciding the union's suit, but we are concerned with the Commission's sua sponte order while the suit for the same relief was pending. Actually, the laches of the union is part and parcel of the unreasonable delay of the Commission.
 
 
 80
 In a suit brought in the United States District Court in the Eastern District of Michigan, the unions here first challenged the original C & O-B & O order issued by the ICC. That case, entitled Brotherhood of Maintenance of Way Employees v. United States, 221 F.Supp. 19 (E.D.Mich.1963), was timely brought. In it the plaintiff and intervenor-Railway Labor Executives' Association attacked numerous aspects of the approved affiliation of the C & O and the B & O but did not "specifically attack" the employee protective provisions of the order which the Commission had imposed upon the two railroads as required by section 5(2)(f).[16] 221 F.Supp. at 28. The District Court dismissed plaintiff's complaint on August 13, 1963, and the Supreme Court on direct appeal affirmed per curiam. Brotherhood of Maintenance of Way Employees v. United States, 375 U.S. 216, 84 S.Ct 341, 11 L.Ed.2d 270 (1963).
 
 
 81
 In fact, the unions never attacked the protective provisions of the ICC order in this case until March 22, 1974 when the "United Transportation Union (UTU) filed with the Commission . . . to reopen the C & O-B & O Case (of 1962) to correct what the UTU purported to be an error in the original decision relative to the employee protective conditions . . . pursuant to 49 U.S.C. § 5(2) (f)." Resp.Br. at 3. UTU contended that during the eleven intervening years, a "de facto" merger had occurred, which caused reroutings that amounted to changed circumstances which in turn justified a reopening of the prior order. (J.A. 5-6). The Commission on that request refused to reopen the prior order, finding "no arguments or issues that would warrant reopening of the above-entitled proceeding or imposing further employee protective conditions." (J.A. 23). A petition for reconsideration was similarly denied. (J.A. 24 et seq.). Then on February 28, 1975, UTU filed suit in the United States District Court for the Northern District of Ohio (C.A. $ C75-174) against the ICC and the United States to set aside the two Commission orders refusing to reopen the 1962 order. (J.A. 39 et seq.). While this action was pending, the Commission, acting sua sponte, "clarified" its 1962 order, as described above.
 
 
 82
 In short, the issues raised in the 1974 petition for reopening, which later led to the 1975 action in Ohio, which culminated in the sua sponte order by the ICC, should have been raised in the 1963 suit in Michigan. When one claims equitable relief, one must act with reasonable promptness. Russell v. Todd, 309 U.S. 280, 287, 60 S.Ct. 527, 84 L.Ed. 754 (1940); Parker v. Dacres, 130 U.S. 43, 50, 9 S.Ct. 433, 32 L.Ed. 848 (1889); Major v. Shaver, 88 U.S.App.D.C. 148, 149, 187 F.2d 211, 212 (1951). "Equity aids the vigilant, not those who slumber in their rights." 2 Pomeroy, Equity Jurisprudence § 418 (5th ed. Symons 1941). Perhaps the obvious conclusiveness of that defense to respondent's Ohio action was what prompted the Commission to act on its own, hoping that great laches would not vitiate their greatly delayed attempt to impose new conditions. But the delay here which exceeded eleven years, and now amounts to fifteen years, is substantially in excess of a reasonable period.
 
 
 83
 Further, the record and briefs in the 1963 Michigan suit indicate that the rerouting of traffic, which apparently led the unions in 1974 to request the greatly delayed "clarification" of the 1962 order, was perceived as a distinct possibility as early as 1962. This is the plain implication of the unions' reference to the harms resulting to employees by the "availability of better routes."[17] Thus, the very substantial delay here in changing the 1962 order should be sufficient to set aside the Commission's "clarification."
 
 VIII. CONCLUSION
 
 84
 The Commission has not shown that the terms of the 1962 order, or the factual situation to which it relates, involves any ambiguity justifying sua sponte clarification. Respondents' reliance on Southern Control II is misplaced. In Southern Control II, the Commission found the existence of an entirely new situation. This resulted from its new order caused by the delinquency of Southern in not complying with the original order, and justified supplementing the prior order. No similar situation has been shown to exist here.
 
 
 85
 The Commission's change in the 1962 order thus amounted to an impermissible substantive alteration of the terms which the Commission thought appropriate in 1962. Pursuant to section 5(9) of the Interstate Commerce Act, the Commission has the power to supplement its prior order to meet the minimum statutory requirements of section 5(2)(f). However, to exercise this power, the Commission must act for good cause, which it has not demonstrated existed here.
 
 
 86
 Finally, the Commission's modification was unreasonably delayed. For all of these reasons, it is my opinion that the June 10, 1975 Supplemental Report and Order of the ICC purporting to "clarify" its 1962 order in this case should be vacated. I respectfully dissent.
 
 APPENDIX
 
 87
 (WASHINGTON JOB PROTECTION AGREEMENT)
 
 
 88
 (MAY 21, 1936)
 
 
 89
 AGREEMENT OF MAY, 1936, WASHINGTON, D. C.
 
 
 90
 This agreement is entered into between the carriers listed and defined in Appendices "A", "B" and "C" attached hereto and made a part hereof, represented by the duly authorized Joint Conference Committee signatory hereto, as party of the first part, and the employes of said carriers, represented by the organizations signatory hereto by their respective duly authorized executives, as party of the second part, and, so far as necessary to carry out the provisions hereof, is also to be construed as a separate agreement by and between and in behalf of each of said carriers and its employes who are now or may hereafter be represented by any of said organizations which now has (or may hereafter have during the life of this agreement) an agreement with such carrier concerning rates of pay, rules or working conditions.
 
 
 91
 The signatories hereto, having been respectively duly authorized as aforesaid to negotiate to a conclusion certain pending issues concerning the treatment of employes who may be affected by coordination as hereinafter defined, hereby agree:
 
 
 92
 Section 1. That the fundamental scope and purpose of this agreement is to provide for allowances to defined employes affected by coordination as hereinafter defined, and it is the intent that the provisions of this agreement are to be restricted to those changes in employment in the Railroad Industry solely due to and resulting from such coordination. Therefore, the parties hereto understand and agree that fluctuations, rises and falls and changes in volume or character of employment brought about solely by other causes are not within the contemplation of the parties hereto, or covered by or intended to be covered by this agreement.
 
 
 93
 Section 2(a). The term "coordination" as used herein means joint action by two or more carriers whereby they unify, consolidate, merge or pool in whole or in part their separate railroad facilities or any of the operations or services previously performed by them through such separate facilities.
 
 
 94
 (b) The term "carrier" as used herein when it refers to other than parties to this agreement means any carrier subject to the provisions of Part I of the Interstate Commerce Act; when it refers to a party to this agreement it means any company or system listed and described in appendices A, B or C as a single carrier party to this agreement.
 
 
 95
 (c) The term "time of coordination" as used herein includes the period following the effective date of a coordination during which changes consequent upon coordination are being made effective; as applying to a particular employee it means the date in said period when that employee is first adversely affected as a result of said coordination.
 
 
 96
 Section 3(a). The provisions of this agreement shall be effective and shall be applied whenever two or more carriers parties hereto undertake a coordination; and it is understood that if a carrier or carriers parties hereto undertake a coordination with a carrier or carriers not parties hereto, such coordination will be made only upon the basis of an agreement approved by all of the carriers parties thereto and all of the organizations of employes involved (parties hereto) of all of the carriers concerned. No coordination involving classes of employes not represented by any of the organizations parties hereto shall be undertaken by the carriers parties hereto except in accord with the provisions of this agreement or agreements arising hereunder.
 
 
 97
 (b) Each carrier listed and established as a separate carrier for the purposes of this agreement, as provided in Appendices "A", "B" and "C", shall be regarded as a separate carrier for the purposes hereof during the life of this agreement; provided, however, that in the case of any coordination involving two or more railroad carriers which also involves the Railway Express Agency, Inc., the latter company shall be treated as a separate carrier with respect to its operations on each of the railroads involved.
 
 
 98
 (c) It is definitely understood that the action of the parties hereto in listing and establishing as a single carrier any system which comprises more than one operating company is taken solely for the purposes of this agreement and shall not be construed or used by either party hereto to limit or affect the rights of the other with respect to matters not falling within the scope and terms of this agreement.
 
 
 99
 Section 4. Each carrier contemplating a coordination shall give at least ninety (90) days written notice of such intended coordination by posting a notice on bulletin boards convenient to the interested employes of each such carrier and by sending registered mail notice to the representatives of such interested employees. Such notice shall contain a full and adequate statement of the proposed changes to be effected by such coordination, including an estimate of the number of employes of each class affected by the intended changes. The date and place of a conference between representatives of all of the parties interested in such intended changes for the purpose of reaching agreements with respect to the application thereto of the terms and conditions of this agreement, shall be agreed upon within ten (10) days after the receipt of said notice, and conference shall commence within thirty (30) days from the date of such notice.
 
 
 100
 Section 5. Each plan of coordination which results in the displacement of employes or rearrangement of forces shall provide for the selection of forces from the employes of all the carriers involved on bases accepted as appropriate for application in the particular case; and any assignment of employes made necessary by a coordination shall be made on the basis of an agreement between the carriers and the organizations of the employes affected, parties hereto. In the event of failure to agree, the dispute may be submitted by either party for adjustment in accordance with Section 13.
 
 
 101
 Section 6(a). No employee of any of the carriers involved in a particular coordination who is continued in service shall, for a period not exceeding five years following the effective date of such coordination, be placed, as a result of such coordination, in a worse position with respect to compensation and rules governing working conditions that he occupied at the time of such coordination so long as he is unable in the normal exercise of his seniority rights under existing agreements, rules and practices to obtain a position producing compensation equal to or exceeding the compensation of the position held by him at the time of the particular coordination, except however, that if he fails to exercise his seniority rights to secure another available position, which does not require a change in residence, to which he is entitled under the working agreement and which carries a rate of pay and compensation exceeding those of the position which he elects to retain, he shall thereafter be treated for the purposes of this section as occupying the position which he elects to decline.
 
 
 102
 (b) The protection afforded by the foregoing paragraph shall be made effective whenever appropriate through what is hereby designated as a "displacement allowance" which shall be determined in each instance in the manner hereinafter described. Any employee entitled to such an allowance is hereinafter referred to as a "displaced" employee.
 
 
 103
 (c) Each displacement allowance shall be a monthly allowance determined by computing the total compensation received by the employee and his total time paid for during the last twelve (12) months in which he performed service immediately preceding the date of his displacement (such twelve (12) months being hereinafter referred to as the "test period") and by dividing separately the total compensation and the total time paid for by twelve, thereby producing the average monthly compensation and average monthly time paid for, which shall be the minimum amounts used to guarantee the displaced employee, and if his compensation in his current position is less in any month in which he performs work than the aforesaid average compensation he shall be paid the difference, less compensation for any time lost on account of voluntary absences to the extent that he is not available for service equivalent to his average monthly time during the test period, but he shall be compensated in addition thereto at the rate of the position filled for any time worked in excess of the average monthly time paid for during the test period.
 
 
 104
 Section 7(a). Any employee of any of the carriers participating in a particular coordination who is deprived of employment as a result of said coordination shall be accorded an allowance (hereinafter termed a coordination allowance), based on length of service, which (except in the case of an employee with less than one year of service) shall be a monthly allowance equivalent in each instance to sixty percent (60%) of the average monthly compensation of the employee in question during the last twelve months of his employment in which he earned compensation prior to the date he is first deprived of employment as a result of the coordination. This coordination allowance will be made to each eligible employee while unemployed by his home road or in the coordinated operation during a period beginning at the date he is first deprived of employment as a result of the coordination and extending in each instance for a length of time determined and limited by the following schedule:
 
 
 105
 Length of Service Period of Payment
 1 yr. & less than 2 yrs. 6 months
 2 yrs. " " " 3 " 12 "
 3 " " " " 5 " 18 "
 5 " " " " 10 " 36 "
10 " " " " 15 " 48 "
15 yrs. and over 60 "
 
 
 106
 In the case of an employee with less than one year of service, the total coordination allowance shall be a lump sum payment in an amount equivalent to sixty (60) days pay at the straight time daily rate of the last position held by him at the time he is deprived of employment as a result of the coordination.
 
 
 107
 (b) For the purposes of this agreement the length of service of the employee shall be determined from the date he last acquired an employment status with the employing carrier and he shall be given credit for one month's service for each month in which he performed any service (in any capacity whatsoever) and twelve such months shall be credited as one year's service. The employment status of an employee shall not be interrupted by furlough in instances where the employee has a right to and does return to service when called. In determining length of service of an employee acting as an officer or other official representative of an employee organization he will be given credit for performing service while so engaged on leave of absence from the service of a carrier.
 
 
 108
 (c) An employee shall be regarded as deprived of his employment and entitled to a coordination allowance in the following cases:
 
 
 109
 1. When the position which he holds on his home road is abolished as result of coordination and he is unable to obtain by the exercise of his seniority rights another position on his home road or a position in the coordinated operation, or
 
 
 110
 2. When the position he holds on his home road is not abolished but he loses that position as a result of the exercise of seniority rights by an employee whose position is abolished as a result of said coordination, or by other employes, brought about as a proximate consequence of the coordination, and if he is unable by the exercise of his seniority rights to secure another position on his home road or a position in the coordinated operation.
 
 
 111
 (d) An employee shall not be regarded as deprived of employment in case of his resignation, death, retirement on pension or on account of age or disability in accordance with the current rules and practices applicable to employees generally, dismissal for justifiable cause in accordance with the rules, or furloughed because of reduction in forces due to seasonal requirements of the service; nor shall any employee be regarded as deprived of employment as the result of a particular coordination who is not deprived of his employment within three years from the effective date of said coordination.
 
 
 112
 (e) Each employee receiving a coordination allowance shall keep the employer informed of his address and the name and address of any other person by whom he may be regularly employed.
 
 
 113
 (f) The coordination allowance shall be paid to the regularly assigned incumbent of the position abolished. If the position of an employee is abolished while he is absent from service, he will be entitled to the coordination allowance when he is available for service. The employee temporarily filling said position at the time it was abolished will be given a coordination allowance on the basis of said position until the regular employee is available for service and thereafter shall revert to his previous status and will be given a coordination allowance accordingly if any is due.
 
 
 114
 (g) An employee receiving a coordination allowance shall be subject to call to return to service after being notified in accordance with the working agreement, and such employee may be required to return to the service of the employing carrier for other reasonably comparable employment for which he is physically and mentally qualified and which does not require a change in his place of residence, if his return does not infringe upon the employment rights of other employes under the working agreement.
 
 
 115
 (h) If an employee who is receiving a coordination allowance returns to service the coordination allowance shall cease while he is so reemployed and the period of time during which he is so reemployed shall be deducted from the total period for which he is entitled to receive a coordination allowance. During the time of such reemployment however he shall be entitled to protection in accordance with the provisions of Section 6.
 
 
 116
 (i) If an employee who is receiving a coordination allowance obtains railroad employment (other than with his home road or in the coordinated operation) his coordination allowance shall be reduced to the extent that the sum total of his earnings in such employment and his allowance exceeds the amount upon which his coordination allowance is based; provided that this shall not apply to employes with less than one year's service.
 
 
 117
 (j) A coordination allowance shall cease prior to the expiration of its prescribed period in the event of:
 
 
 118
 1. Failure without good cause to return to service in accordance with working agreement after being notified of position for which he is eligible and as provided in paragraphs (g) and (h).
 
 
 119
 2. Resignation.
 
 
 120
 3. Death.
 
 
 121
 4. Retirement on pension or on account of age or disability in accordance with the current rules and practices applicable to employes generally.
 
 
 122
 5. Dismissal for justifiable cause.
 
 
 123
 Section 8. An employee affected by a particular coordination shall not be deprived of benefits attaching to his previous employment, such as free transportation, pensions, hospitalization, relief, etc., under the same conditions and so long as such benefits continue to be accorded to other employes on his home road, in active service or on furlough as the case may be, to the extent that such benefits can be so maintained under present authority of law or corporate action or through future authorization which may be obtained.
 
 
 124
 Section 9. Any employee eligible to receive a coordination allowance under Section 7 hereof may, at his option at the time of coordination, resign and (in lieu of all other benefits and protections provided in this agreement) accept in a lump sum a separation allowance determined in accordance with the following schedule:
 
 
 125
 Length of Service Separation Allowance
 1 year & less than 2yrs. 3 months' pay
 2 years & " " 3 " 6 " "
 3 " " " " 5 " 9 " "
 5 " " " " 10 " 12 " "
10 " " " " 15 " 12 " "
15 years and over 12 " "
 
 
 126
 In the case of employes with less than one year's service, five days' pay, at the rate of the position last occupied, for each month in which they performed service will be paid as the lump sum.
 
 
 127
 (a) Length of service shall be computed as provided in Section 7.
 
 
 128
 (b) One month's pay shall be computed by multiplying by 30 the daily rate of pay received by the employee in the position last occupied prior to time of coordination.
 
 
 129
 Section 10. (a) Any employee who is retained in the service of any carrier involved in a particular coordination (or who is later restored to service from the group of employes entitled to receive a coordination allowance) who is required to change the point of his employment as result of such coordination and is therefore required to move his place of residence, shall be reimbursed for all expenses of moving his household and other personal effects and for the traveling expenses of himself and members of his family, including living expenses for himself and his family and his own actual wage loss during the time necessary for such transfer and for a reasonable time thereafter, (not to exceed two working days), used in securing a place of residence in his new location. The exact extent of the responsibility of the carrier under this provision and the ways and means of transportation shall be agreed upon in advance between the carrier responsible and the organization of the employee affected. No claim for expenses under this Section shall be allowed unless they are incurred within three years from the date of coordination and the claim must be submitted within ninety (90) days after the expenses are incurred.
 
 
 130
 (b) If any such employee is furloughed within three years after changing his point of employment as a result of coordination and elects to move his place of residence back to his original point of employment, the carrier shall assume the expense of moving his household and other personal effects under the conditions imposed in paragraph (a) of this section.
 
 
 131
 (c) Except to the extent provided in paragraph (b) changes in place of residence subsequent to the initial changes caused by coordination and which grow out of the normal exercise of seniority in accordance with working agreements are not comprehended within the provisions of this section.
 
 
 132
 Section 11(a). The following provisions shall apply, to the extent they are applicable in each instance, to any employee who is retained in the service of any of the carriers involved in a particular coordination (or who is later restored to such service from the group of employes entitled to receive a coordination allowance) who is required to change the point of his employment as a result of such coordination and is therefore required to move his place of residence:
 
 
 133
 1. If the employee owns his own home in the locality from which he is required to move, he shall at his option be reimbursed by his employing carrier for any loss suffered in the sale of his home for less than its fair value. In each case the fair value of the home in question shall be determined as of a date sufficiently prior to the coordination to be unaffected thereby. The employing carrier shall in each instance be afforded an opportunity to purchase the home at such fair value before it is sold by the employee to any other party.
 
 
 134
 2. If the employee is under a contract to purchase his home, the employing carrier shall protect him against loss to the extent of the fair value of any equity he may have in the home and in addition shall relieve him from any further obligations under his contract.
 
 
 135
 3. If the employee holds an unexpired lease of a dwelling occupied by him as his home, the employing carrier shall protect him from all loss and cost in securing the cancellation of his said lease.
 
 
 136
 (b) Changes in place of residence subsequent to the initial change caused by coordination and which grow out of the normal exercise of seniority in accordance with working agreements are not comprehended within the provisions of this Section.
 
 
 137
 (c) No claim for loss shall be paid under the provisions of this section which is not presented within three years after the effective date of the coordination.
 
 
 138
 (d) Should a controversy arise in respect to the value of the home, the loss sustained in its sale, the loss under a contract for purchase, loss and cost in securing termination of lease, or any other question in connection with these matters, it shall be decided through joint conference between the representatives of the employes and the carrier on whose line the controversy arises and in the event they are unable to agree, the dispute may be referred by either party to a board of three competent real estate appraisers, selected in the following manner: One to be selected by the representatives of the employes and the carrier, respectively; these two shall endeavor by agreement within ten days after their appointment to select the third appraiser, or to select some person authorized to name the third appraiser, and in the event of failure to agree then the Chairman of the Interstate Commerce Commission shall be requested to appoint the third appraiser. A decision of a majority of the appraisers shall be required and said decision shall be final and conclusive. The salary and expenses of the third or neutral appraiser, including the expenses of the appraisal board, shall be borne equally by the parties to the proceedings. All other expenses shall be paid by the party incurring them, including the salary of the appraiser selected by such party.
 
 
 139
 Section 12. If any carrier shall rearrange or adjust its forces in anticipation of a coordination, with the purpose or effect of depriving an employee of benefits to which he should be entitled under this agreement as an employee immediately affected by a coordination, this agreement shall apply to such an employee as of the date when he is so affected.
 
 
 140
 Section 13. In the event that any dispute or controversy arises (except as defined in Section 11) in connection with a particular coordination, including an interpretation, application or enforcement of any of the provisions of this agreement (or of the agreement entered into between the carriers and the representatives of the employes relating to said coordination as contemplated by this agreement) which is not composed by the parties thereto within thirty days after same arises, it may be referred by either party for consideration and determination to a Committee which is hereby established, composed in the first instance of the signatories to this agreement. Each party to this agreement may name such persons from time to time as each party desires to serve on such Committee as its representatives in substitution for such original members. Should the Committee be unable to agree, it shall select a neutral referee and in the event it is unable to agree within 10 days upon the selection of said referee, then the members on either side may request the National Mediation Board to appoint a referee. The case shall again be considered by the Committee and the referee and the decision of the referee shall be final and conclusive. The salary and expenses of the referee shall be borne equally by the parties to the proceeding; all other expenses shall be paid by the party incurring them.
 
 
 141
 Section 14. Any carrier not initially a party to this agreement may become a party by serving notice of its desire to do so by mail upon the members of the Committee established by Section 13 hereof. It shall become a party as of the date of the service of such notice or upon such later date as may be specified therein.
 
 
 142
 Section 15. This agreement shall be effective June 18, 1936, and be in full force and effect for a period of five years from that date and continue in effect thereafter with the privilege that any carrier or organization party hereto may then withdraw from the agreement after one year from having served notice of its intention so to withdraw; provided, however, that any rights of the parties hereto or of individuals established and fixed during the term of this agreement shall continue in full force and effect, notwithstanding the expiration of the agreement or the exercise by a carrier or an organization of the right to withdraw therefrom.
 
 
 143
 This agreement shall be subject to revision by mutual agreement of the parties hereto at any time, but only after the serving of a sixty (60) days notice by either party upon the other.
 
 
 144
 (SIGNATURES AND APPENDICES OMITTED.)
 
 
 
 [1]
 49 U.S.C. § 5(9)
 
 
 [2]
 Article I(1)(e) defines "protective period" as
 that period of time from the date on which an employee is displaced or dismissed to the expiration of 4 years from the effective date of the order authorizing the transaction; provided, however, that the protective period for any particular employee shall not continue for a longer period following the effective date of said order than the period during which such employee was in the employ of the carrier prior to the effective date of the order.
 Article I(2) provides, in pertinent part:
 Displacement allowances. (a) So long after his displacement as he is unable, in the exercise of his seniority rights under existing agreements, rules and practices, to obtain a position producing compensation equal to or exceeding the compensation he received in the position from which he was displaced, during the protective period a displaced employee shall be paid a monthly displacement allowance. . . .
 Article I(3) provides, in pertinent part:
 Dismissal allowances. (a) A dismissed employee shall be paid a monthly dismissal allowance, from the date he is deprived of employment and continuing during the protective period. . . .
 Article II(1) provides:
 Any employee adversely affected as a result of the transaction, within 4 years from the effective date of the order approving the transaction, shall receive as a minimum the protection afforded by article I hereof for the period he is adversely affected prior to the expiration of 4 years from the effective date of the order of approval, and any such employee so adversely affected who has received under such conditions total dismissal or displacement compensation less than that which he would receive by applying the Washington Agreement of May 21, 1936, as limited by paragraph 2 of this article, for the full protective period therein provided from the time he is first adversely affected, shall continue to receive benefits under the terms of the Washington Agreement, as limited, until the total compensatory benefits provided therein for the particular period of service have been paid.
 
 
 [3]
 In the text of the 1962 order, the Commission stated:
 It is our opinion that the protection afforded by the New Orleans conditions, as modified in the Southern Control case (to require arbitration) will more than meet the minimum requirements of section 5(2)(f). In effect, the New Orleans conditions superimpose upon the Oklahoma conditions (Oklahoma Ry. Co. Trustees Abandonment, 257 I.C.C. 177) the provisions of the Washington Agreement, the protection of the Oklahoma conditions to be applied as a minimum. As we stated in the Southern Control case, the New Orleans conditions "were imposed for the specific purpose of giving protection to those employees who knowingly were not to be adversely affected in their employment until a substantial period elapsed after the date of the order authorizing the transaction and who otherwise would have received little or no protection under the Oklahoma conditions."
 As . . . modified in the Southern Control case, the New Orleans conditions will be fair to the affected employees and to the carriers involved in the transaction. In the past, these conditions have been acceptable to employees as well as carriers. It is observed that many of the provisions specifically requested by the association are similar to, or based upon language used in the Washington Agreement. Of course, to the extent that the Washington Agreement becomes applicable, the terms and conditions thereof will apply.
 
 
 [4]
 The C&O and B&O urge that, in lieu of the conditions recommended by the examiner, we impose the conditions prescribed in New Orleans Union Passenger Terminal case, 282 I.C.C. 271, with some modifications which would provide a workable arbitration clause
 
 
 [317]
 I.C.C. at 286-87
 
 
 [5]
 Both the Chesapeake & Ohio and the Baltimore & Ohio were parties to the Washington Job Protection Agreement of May, 1936
 
 
 [6]
 The Oklahoma conditions were set in Oklahoma Ry. Trustees-Abandonment of Operations, 257 I.C.C. 177 (1944)
 
 
 [7]
 Railway Labor Executives Assn. v. United States, 339 U.S. 142, 70 S.Ct. 530, 94 L.Ed. 721 (1950)
 
 
 [8]
 The New Orleans conditions were established in New Orleans Union Passenger Terminal Case, 282 I.C.C. 271 (1952)
 
 
 [9]
 It is clear that the Commission, in its New Orleans order, determined that protection extending beyond the provisions of the Oklahoma conditions was required to meet the "fair and equitable" standard under the facts of that case:
 The problem now presented is to determine what, if any, protective conditions in addition to those prescribed in the previous report are necessary to provide a fair and equitable arrangement for the employees who have been or will be adversely affected by the transaction . . ..
 
 
 [282]
 I.C.C. at 274
 (A) finding herein that the Oklahoma conditions alone with the time limit therein prescribed, having in mind not only the 4-year maximum but also the limitation as to time worked prior to the effective date of our order (another limitation of the Oklahoma conditions) would provide a fair and equitable arrangement, would not be consistent with the circumstances in this case nor in conformity with the decision of the Supreme Court of the United States. It then is necessary to decide what type of conditions are necessary to meet the requirements of the statute.
 Id. at 280.
 By referring to the "New Orleans conditions" in its 1962 order, the Commission obviously expressed a similar determination that protection beyond that provided by the Oklahoma conditions was required by the case before it.
 
 
 [10]
 Southern Ry. Control Central of Ga. Ry., 317 I.C.C. 557 (1962)
 
 
 [11]
 RLEA had challenged the failure of the ICC to include Sections 4, 5 and 9 of the Washington Agreement in its codified provisions, and the Supreme Court's remand referred to those provisions only
 
 
 [12]
 FCC v. Pottsville Broadcasting Co., 309 U.S. 134, 141-44, 60 S.Ct. 437, 84 L.Ed. 656 (1940)
 
 
 [13]
 See note 12 supra
 
 
 [14]
 Southern Railway Company v. U.S. & ICC, 412 F.Supp. 1122 (D.D.C.1976)
 
 
 [1]
 Chesapeake & Ohio Ry. Co. Control Baltimore & Ohio Ry. Co., 317 I.C.C. 261 (Dec. 17, 1962). 49 U.S.C. § 5(2)(g)(i) (1970) authorizes the ICC to approve such acquisitions
 
 
 [2]
 To better understand this case, the Washington Job Protection Agreement of May 21, 1936 is attached as an appendix
 
 
 [3]
 The Commission rejected certain aspects, not here relevant, of the Washington Agreement. 282 I.C.C. at 281-82
 
 
 [4]
 If anything is ambiguous in the present case, see dissenting opinion, 187 U.S.App.D.C. at ---, 571 F.2d at 1193, infra, it is the Commission's interpretation of the Washington Agreement and the New Orleans conditions in its 1975 order. This order's ultimate findings state that the employees of the carriers are entitled to the protection afforded by the conditions specified in New Orleans Union Passenger Terminal Case, 282 I.C.C. 271 (1952) (J.A. 60). These conditions provide protection to the employee for a period calculated from the time of the adverse effect so long as that effect occurs within "five years following the effective date of (the) coordination." 282 I.C.C. at 281-82; Washington Job Protection Agreement, § 6(a). Compare majority opinion, 187 U.S.App.D.C. at ---, 571 F.2d at 1201-1204. Yet the text of the Commission's 1975 order makes no reference to the five-year limitation: "(W) hen an employee is first adversely affected as a result of the approved transaction after four years from the effective date of the Commission's order, that employee is entitled to protection from the time of the adverse effect." Id. In short, the text of the Commission's 1975 order does not comport with the correct interpretation of the New Orleans conditions: the explanation of the 1975 order states that the protective period shall run indefinitely, while the New Orleans conditions contained a five-year limit running from the effective date of the coordination
 
 
 [5]
 The language of the Washington Agreement of 1936 has figured importantly in prior ICC orders, and is also important to this case. However, the scope of the protections afforded by that Agreement is easily misconstrued. For example, in New Orleans, the Commission stated that the Agreement extended protection to displaced employees from the date of the first adverse effect for a total period not exceeding five years. 282 I.C.C. at 275. As to dismissed employees, the Commission read the Agreement as extending protection from the date of the first adverse effect which must be within three years after the effective date of the coordination. Id. The Commission's statement regarding the protection afforded dismissed employees is correct, but the same for displaced employees should read: the Agreement extended protection to displaced employees for a period not exceeding five years from the date of the first adverse effect, so long as the adverse effect was felt within five years of the effective date of the coordination. See Washington Agreement, sections 6(a), 7(a). Thus, it is clear that the Washington Agreement has a five-year limit running from the effective date of the coordination (as the term "coordination" is defined in section 2(a)). It does not extend the protective period for an indefinite period during which a participant in an approved transaction is required to protect its employees from a worsening in their position. The effective date of the coordination is the date on which the parties effectuate the contemplated act of coordination. Here that is the date stock control was acquired. To receive benefits under the Washington Agreement, an employee must show that his adverse effect occurred within five years of that date
 
 
 [6]
 Opinion on reconsideration filed June 10, 1963, 317 I.C.C. 729 (1963). This opinion made no reference to the protective period
 
 
 [7]
 The court's opinion states:
 R.L.E.A. centers its attack upon the refusal of the Commission to impose conditions which would:
 (a) Require proposed consolidation of facilities resulting from the transaction be with the consent of, or after arbitration with, representatives of employees of both carriers.
 (b) Grant affected employees dismissal or displacement compensation upon refusal to accept carrier-offered employment involving a change of residence.
 (c) Continue all former "fringe benefits" of dismissed employees notwithstanding their termination, for all retained employees on the home road.
 (d) Grant employees an option of lump-sum separation payment in lieu of payments over the protection period.
 
 
 [226]
 F.Supp. at 523
 
 
 [8]
 Sections 4, 5, and 9 of the Washington Agreement are set forth in the appendix hereto
 
 
 [9]
 The Commission observed that Southern had bestowed improper preferences upon Southern employees which discriminated against the seniority rights of Central employees. 331 I.C.C. at 185. It noted that had sections 4, 5, and 9 of the Washington Agreement been complied with, "agreements would have been negotiated (between the Southern Railway and other interested parties) which would have integrated the seniority rights of the Central employees with those of the Southern employees, but on a basis agreed to by all parties." Id. Thus, in complying with the modified order, the application of the Washington Agreement, and even-handed seniority between the employees of the two railroads, would cause many Southern employees to be "adversely affected" for the first time
 
 
 [10]
 The Commission specifically stated:
 The evidence presented on further hearing has established that a number of employees who were employed on, or carried on the rosters of, the applicant-railroads at the time of the consummation of the transaction but who, to date, have not been adversely affected thereby, will be so affected when applicants do comply with the provisions of sections 4 and 5 of the Washington Agreement. The evidence on further hearing also establishes that, unless we interpose adequate supplemental conditions in this proceeding, certain employees, who are adversely affected as a direct result of the transaction involved herein, may be without the protection which are required by the provisions of section 5(2) (f) to afford.
 
 
 [331]
 I.C.C. at 184
 
 
 [11]
 Section 5(9) of the Interstate Commerce Act provides as follows:
 The Commission may from time to time, for good cause shown, make such orders, supplemental to any order made under paragraph (1), (2), or (7) of this section, as it may deem necessary or appropriate.
 49 U.S.C. § 5(9) (1970). Here, the Commission has not cited any "good cause" for reopening the 1962 order. The reasons which the Commission has provided do not amount to "good cause." UTU initially argued in its petition to reopen the 1962 order that "changed circumstances" might exist in this case, but this contention, irrespective of its merits, was not advanced in a timely fashion. See note 14.
 
 
 [12]
 In response to the exceptions of the C & O and the B & O to the hearing examiner's recommended employee protective conditions, the Commission stated: "We agree with the carriers that the recommended conditions are dissimilar in a number of respects from those heretofore imposed by us in unification proceedings." 317 I.C.C. at 287 (emphasis added). The majority state that the conditions intended to be imposed in this case were the New Orleans conditions with only one modification, that being with respect to arbitration of disputes. However, the Commission's statement that the conditions imposed in this case "conform substantially to the New Orleans conditions with a modification in the provision respecting the arbitration of disputes" (317 I.C.C. at 288, emphasis added) does not support an interpretation that the Commission intended only one modification in the New Orleans conditions. Given the fact that the Commission expressly took notice of the union's exception to the four-year protection period (see p. 21 infra ), that the Commission used the word "substantially," and that the Commission stated that the examiner's recommended conditions, to which both parties excepted and for which the New Orleans conditions were offered as a substitute, differed in a number of respects from conditions imposed in prior unification proceedings (e. g. the New Orleans conditions), it can only be concluded that the language of the Commission's order "4 years from the effective date of the order authorizing the transaction." (317 I.C.C. at 346) means exactly what it says. In Cameron v. Civil Aeronautics Board, 140 F.2d 482 (7th Cir. 1944), the court stated:
 Administrative orders, like statutes, are not to be given strained and unnatural constructions. As was said in Lynch v. Alworth-Stephens Co., 267 U.S. 364, 370, . . ." * * * the plain, obvious and rational meaning of a statute is always to be preferred to any curious, narrow, hidden sense that nothing but the exigency of a hard case and the ingenuity and study of an acute and powerful intellect would discover." The language of a regulation should be considered as intended to guide and not to entrap those who are governed by it.
 140 F.2d at 488. Cf. Pacific Gas and Electric Co. v. Federal Power Commission, 164 U.S.App.D.C. 371, 378, 506 F.2d 33, 40 (1974) ("(A) policy judgment expressed as a general statement of policy is entitled to less deference than a decision expressed as a rule or an adjudicative order."). But even if the majority's reading of the opinion accompanying the Commission's order were correct, that is, even if the text of the opinion implied that the Commission intended to impose the New Orleans conditions with only one modification in this case, we should still hold that the plain meaning of the language of the order itself, meaning Appendix VIII, should control. When construing the ultimate conclusions of an agency in such a case, preliminary interpretative comments should yield to the unambiguous language of the conclusions. This is the same principal which has served jurisprudence well in the context of contract law. When the terms of a contract are ambiguous, it is permissible for a court to consider evidence of prior negotiations and of preliminary comments. United States v. Bethlehem Steel Co., 205 U.S. 105, 118, 27 S.Ct. 450, 51 L.Ed. 731 (1907); Morris v. United States, 219 F.2d 541, 543 (10th Cir. 1955). However, when the written terms are clear and unambiguous, those terms should control, irrespective of the content of prior interpretative comments. Robin v. Sun Oil Co., 548 F.2d 554, 557 (5th Cir. 1977); Stearns v. Hertz Corp., 326 F.2d 405, 408 (8th Cir.), cert. denied, 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964).
 
 
 [13]
 "The hearings (on the C & O-B & O merger) had extended from June 19 to October 9, 1961. They were held in seven cities, some 394 witnesses were heard, whose testimony resulted in a transcript of 5686 pages and some 550 exhibits were received. Upwards of 100 intervenors appeared, many of whom opposed the C & O applications. More than 60 attorneys appeared for the intervenors." Brotherhood of Maintenance of Way Employees v. United States, 221 F.Supp. 19, 22 n.1 (E.D.Mich.1963)
 
 
 [14]
 The union recommended attrition conditions, and it is true that the railroads at one point did urge in response to the union's suggestion for attrition conditions, which amount to an employment freeze that the New Orleans conditions be imposed. 317 I.C.C. at 286-87
 
 
 [15]
 Of course, this does not mean that an "ambiguity" in a Commission order might not amount to "good cause" justifying a supplementary order under other circumstances. For example, if a Commission order were so unclear as to be incomprehensible, "good cause" would exist to enter a supplementary order. Also, "good cause" can be found to exist in certain circumstances of ambiguity short of this extreme. However, in this case, there is no lack of clarity which by itself constitutes "good cause" within the meaning of 49 U.S.C. § 5(9) (1970) and thereby justifies the Commission's action
 
 
 [16]
 Plaintiff, Brotherhood of Maintenance of Way Employees, and intervenor, Railway Labor Executives' Association, do not specifically attack that portion of the Commission's report which provides for the protection of the employees of the involved railroads as required by subsection (f) of Section 5(2), Title 49 U.S.C.A
 Brotherhood of Maintenance of Way Employees v. United States, 221 F.Supp. 19, 28 (E.D.Mich.1963). Accord, Motion to Affirm at 8, Brotherhood of Maintenance of Way Employees v. United States, 375 U.S. 216, 84 S.Ct. 341, 11 L.Ed.2d 270 (1963): "The applicants raise no question as to the sufficiency of the conditions imposed by the Commission for the protection of their members or other employees of C & O and B & O who may be adversely affected by the transaction." While it is true that the union did in 1963 express concern for the welfare of employees of the C & O and B & O in the aftermath of the effectuation of the Commission's order, 221 F.Supp. at 29, the union made no effort to link this concern with the specific safeguards imposed by the Commission to avoid these adverse consequences.
 
 
 [17]
 UTU initially argued in its petition to reopen the Commission's 1962 order that a de facto merger had occurred between the C & O and B & O, which resulted in a rerouting of certain shipments to the detriment of employees on the routes no longer being used. Petition of United Transportation Union for Reopening at 4-9, J.A. 4-9; accord, Complaint in United Transportation Union v. United States, No. 75-174 (N.D.Ohio), dismissed, Oct. 29, 1975, at 7-8, J.A. 45-46. However, the effects of rerouting over all roads by the "availability of better routes" was considered by the unions from the very start of the affiliation. Judicial notice is taken of the union's complaint in the United States District Court for the Eastern District of Michigan in the 1963 suit challenging the Commission's 1962 order. Wells v. United States, 318 U.S. 257, 260, 63 S.Ct. 582, 87 L.Ed. 586 (1943); Jones v. Attorney General of the United States, 278 F.2d 699, 701 (8th Cir. 1960); Zahn v. Transamerica Corp., 162 F.2d 36, 48 n.20 (3d Cir. 1947). See Butler v. Eaton, 141 U.S. 240, 244, 11 S.Ct. 985, 35 L.Ed. 713 (1891); United States v. Gorham, 175 U.S.App.D.C. 383, 387-88, 536 F.2d 410, 414-15 (1976); T.V.T. Corp. v. Basiliko, 103 U.S.App.D.C. 181, 183, 257 F.2d 185, 187 (1958). This complaint alleged:
 As a result of the Commission's order herein, many employees of the Chesapeake & Ohio Railway Company, the Baltimore & Ohio Railroad Company, the New York Central Railroad Company, and other railroads from whom the C&O and B& O will divert traffic as a result of combining their routes pursuant to the approval of the control application, represented by plaintiff, will suffer irreparable injury through the permanent loss of seniority and employment rights with those railroads in violation of the requirements of Section 5(2).
 Complaint at 5, Brotherhood of Maintenance of Way Employees v. United States, 221 F.Supp. 19 (E.D.Mich.1963) (emphasis added). The emphasized language above serves to describe the causal relationship between the adverse effect on employees of railroads other than the C & O and B & O and the combination of routes. Nevertheless, this language clearly indicates that the union did realize that routes would be combined as a result of the Commission's 1962 order. See also Reply of Appellants to Motions to Affirm at 4, Brotherhood of Maintenance of Way Employees v. United States, 375 U.S. 216, (1963). So the unions from the very start were fully aware of rerouting within the C & O-B & O affiliation. This fact is clearly inconsistent with the union's position taken in the petition for reopening of the 1962 order, see J.A. 4-9, where it was argued that the changed circumstances, i. e., the rerouting, were not perceived until recent years.