## HOPE NATURAL GAS CO. v. FEDERAL POWER COMMISSION.

No. 6365.

United States Court of Appeals
Fourth Circuit.

Argued April 3, 1952.

Decided May 14, 1952.

William A. Dougherty, New York City (C. W. Cooper and Henry F. Lippitt, 2nd, New York City, on brief), for petitioner.

Bernard A. Foster, Jr., Asst. General Counsel, Federal Power Commission, Washington, D. C. (Bradford Ross, General Counsel, Howell Purdue, Harry R. Van Cleve, Jr., Reuben Goldberg and Pascal B. Frazier, Attorneys, Federal Power Com-

mission, all of Washington, D. C., on brief), for respondent.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

PARKER, Chief Judge.

This is a petition by the Hope Natural Gas Company asking that we review and modify an order of the Federal Power Commission. In September 1949, Hope filed with the Commission, pursuant to section 4 (d) of the Natural Gas Act, 15 U.S.C.A. § 717c(d), a new schedule of rates, materially increasing the rates charged to five of its six wholesale customers. On October 31, 1949, the Commission entered an order providing for a hearing on the reasonableness of the proposed rates and suspending their operation pursuant to section 4 (e) of the act. The proceeding not having been concluded by April 1, 1950, the five months period prescribed by the subsection, Hope moved pursuant thereto that the proposed rates go into effect and an order was entered permitting this upon Hope's giving bond to make any refunds which the Commission might order of amounts collected by reason of the increase. On August 10, 1951, the Commission entered an order disallowing as unreasonable the increased rates filed but directed the filing of other rates somewhat lower than those filed,[1] making them effective as of April 1, 1950, and directing that Hope, pursuant to its bond, refund within 45 days the excess collected over the rates thus allowed.

Shortly after the entry of the suspension order on October 31, 1949, Hope made a motion that it be allowed to put the increased rates which it had filed into immediate effect and file bond for the refund of any portion thereof held unreasonable, giving as one of the reasons therefor that if the rates were not put into effect a permanent loss of net income would result. This motion was denied on the ground that the action sought was not authorized by the act and would result in circumventing the statutory scheme provided by section 4 (e). Following the Commission's order of August 10, 1951, Hope filed a petition for rehearing asking that the increased rates allowed by the order be made effective from November 1, 1949, through the perod that the rates filed by Hope had been suspended.[2] This petition was denied, and its denial furnishes the sole ground upon which review of the Commission's order is asked. In denying it the Commission said:

"Hope's claim that the rates should be made effective as of November 1, 1949, or at least as to March 1950 deliveries, is without merit. The claim is contrary to the provisions of section 4(e) that the operation of a proposed increased rate may be suspended for a five-month period pending hearing and decision thereon, and that, 'if the proceeding has not been concluded and an order made at the expiration of the suspension period, on motion of the natural-gas company making the filing, the proposed change of rate' shall go into effect, subject to the right of the Commission to require the furnishing of a bond conditioned upon the company's refunding amounts in excess of those rates determined by the Commission to be proper. In this manner, a proposed increase may be made effective at or after the expiration of the suspension period. No provision is made for an earlier effective date under these circumstances, even upon the posting of a bond. It thus seems perfectly clear that Congress did not in-

| 1. | Prior Rates | Rates proposed by Hope | Increase Allowed |
|---|---|---|---|
| East Ohio | 29.25 cts per m. c. f. | 32 | 2.25 |
| Peoples | 28 | 29 | 1 |
| N. Y. Natural | 29.25 | 30.25 | .75 |
| Manufacturers | 28 | 30 . | 1.50 |
| Mt. Morris | 28 | 30 | 1.50 |

2. This would result in Hope's collecting an increase of approximately $750,000 during the suspension period. Practically all of this increase will come from 4 of Hope's 6 customers and these are corporations affiliated with Hope and they consent to the increase.

tend that an increase in suspended rates be allowed to become effective prior to the expiration of the suspension period unless the proceeding has been 'concluded' at an earlier date. And there is a corresponding lack of basis for implying that the Commission has such authority. Furthermore, section 4 (e) also provides that: ' * * .* after full hearings, either completed before or after the rate * * * goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective.' Such a 'proceeding initiated after it (the rate) had become effective' could only be one under section 5 (a) of the Act. The Commission's power to fix rates under section 5 (a) is prospective only, and rates so fixed are applicable only to the future. Here, the proposed increase became effective under bond at the expiration of the suspension period on April 1, 1950."

We think that the Commission's interpretation of the language of the statute is correct. The Commission is given no power to enter reparation orders with respect to rates. Its power over rates, which is prescribed by section 5 (a), 15 U.S.C.A. § 717d(a), is to determine after a hearing whether existing rates are unjust, unreasonable, discriminatory or preferential, and, if so, to prescribe the just and reasonable rate "to be thereafter observed and in force". If it suspends a proposed new rate under section 4(e), and enters upon a hearing pursuant to that section, it can make only such orders with respect thereto "as would be proper in a proceeding initiated after it had become effective", i. e. a proceeding under section 5 (a). As said by the Supreme Court in Federal Power Comm. v. Hope Natural Gas Co., 320 U.S. 591, 618, 64 S.Ct. 281, 295, 88 L.Ed. 333, "It is conceded that under the Act the Commission has no power to make reparation orders. And its power to fix rates admittedly is limited to those 'to be thereafter observed and in force.' "

There is nothing in section 4(e)[3] of the act which lends support to the contention

3. "(e) Whenever any such new schedule is filed the Commission shall have authority, either upon complaint of any State, municipality, or State commission, or upon its own initiative without complaint, at once, and if it so orders, without answer or formal pleading by the natural-gas company, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the natural-gas company affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect: Provided, That the Commission shall not have authority to suspend the rate, charge, classification, or service for the sale of natural gas for resale for industrial use only; and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of the suspension period, on motion of the natural-gas company making the filing, the proposed change of rate, charge, classification, or service shall go into effect. Where increased rates or charges are thus made effective, the Commission may, by order, require the natural-gas company to furnish a bond, to be approved by the Commission, to refund any amounts ordered by the Commission, to keep accurate accounts in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts were paid, and, upon completion of the hearing and decision, to order such natural-gas company to refund, with interest, the portion of such increased rates or charges by its decision found not justified. At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the natural-gas company, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible."

that upon a determination made thereunder the rates so determined may be given effect through the suspension period. If Congress had so intended, it would have been easy enough to have said so. Some states provide for putting a suspended rate into effect immediately by filing a bond for the repayment of any excess found. See Baldwin's Kentucky Revised Statutes, 1943 Revision 278.190 (3952–16); New Mexico Statutes 1941 Annotated 72–607; General Statutes of North Carolina 62–71; Vermont Statutes, Revision of 1947, 9376. No such provision was inserted in the statute here under consideration. It is argued that it is as reasonable to make the rates retroactive to the beginning of the suspension period as to the end thereof. The answer is that Congress made express provision for the refund of the excess portion of rates collected after the expiration of the suspension period but made no provision whatever for collecting any additional amount for the period of suspension.

There is nothing in section 4 (d) of the act which supports Hope's position.[4] Reliance is placed upon the acceleration clause of that subsection which provides: "The Commission, for good cause shown, may allow changes to take effect without requiring the thirty days' notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published." This provision has application, however, not where a suspension order is entered and an inquiry is conducted as to the reasonableness of the changes proposed, but where the Commission, for good cause shown, allows company-proposed changes in rates to take effect without requiring the 30-day notice for which the section provides. The Commission does not exercise its rule making powers with respect to rates filed under this section; and we are advised that orders filed thereunder regularly include a provision that they shall not "be construed as constituting approval by the Commission of any service, rate, charge, classifications * * *" provided for in the change filed. Under section 4 (e) of the act, on the other hand, the Commission is exercising its rate making powers under which it may prescribe only rates "to be thereafter observed and in force". Hope refers to certain orders and rulings of the Commission made under section 4 (d) as permitting the retroactive operation of rates; but it is clear that the practice allowed under this section throws no light on the power of the Commission, in the exercise of its rate making powers to make rates effective during the suspension period provided for under section 4 (e). Where the Commission suspends a rate and enters upon a rate making inquiry under that subsection it is doing precisely the opposite of allowing the proposed rate "to take effect without requiring the thirty days' notice", and consequently 4 (d) could have no application.

There can be little doubt as to the correctness of the Commission's decision, if it be remembered that the language of the suspension provision of the statute here under interpretation was taken bodily from the Interstate Commerce Act[5] and that it

4. That section provides:
"(d) Unless the Commission otherwise orders, no change shall be made by any natural-gas company in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after thirty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow changes to take effect without requiring the thirty days' notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published."

5. See Mann-Elkins Act of June 18, 1910, sec. 12, 36 Stat. 539, 551, Transportation Act of 1920, sec. 418, 41 Stat. 486–487, amending Interstate Commerce Act, sec. 15 (7), Act March 4, 1927, 44 Stat. Part 2, pp. 1447–1448, 49 U.S.C.A. § 15 (7). This provision was adopted also

has there long been given the interpretation placed upon it by the Commission here. The Mann-Elkins Act of 1910 permitted a suspension of rates for 120 days with provision for an additional period of suspension of six months. The transportation Act of 1920 reduced the maximum period of suspension from ten to five months. The act of 1927 increased this suspension period from five to seven months. Under none of these acts has it ever been the rule that increased rates allowed after a period of suspension could be made retroactive during that period. Scharfman (The Interstate Commerce Commission, vol. 1, pp. 201–202) in his discussion of the rate suspension principle, points this out very clearly in the following excerpt:

"But this protection of the shippers tended to operate to the undue detriment of the carriers. The old rates remained in effect till the completion of the Commission's investigation, although the proposed changes in rates, in whole or in part, might be found at its conclusion to be justified; and no means was available to the carriers for recouping the losses in revenue incurred in the interim. In view of the general trend toward rising prices and increasing costs, the protracted investigation authorized by the original provisions—an aggregate period of ten months from the date when the proposed rates would otherwise have become effective—was deemed unjust to the railroads and insufficiently responsive to changing transportation conditions. Accordingly, the 1920 legislation, without relinquishing the suspension principle or destroying its essential utility, shortened the statutory interval during which the new rates, if suspended, must remain inoperative. The initial suspension period of one hundred and twenty days was retained; but if the Commission is unable to conclude the proceeding within that time, it was authorized to extend the period for not more than thirty days (rather than six months, as theretofore), thereby reducing the total period of suspension from ten to five months. Upon failure of the Commission to issue an order within this prescribed period, the proposed changes in rates were automatically to become effective, although the Commission might continue its investigation and bring it to decision. As a counter-protection to the shipper, in case of increases in freight rates effectuated under such circumstances, the Commission was empowered to require the carriers involved to keep account of all amounts received through these · increases, and upon completion of its investigation, to order these carriers 'to refund with interest, to the persons on whose behalf such amounts were paid such portion of such increased rates or charges as by its decision shall be found not justified.' "

■■■ The settled construction by the Interstate Commerce Commission of the suspension provision of the Interstate Commerce Act is that, when the Commission suspends a rate, the old rate is continued in effect pending the investigation and subsequent orders allowing increased rates are given only prospective operation. Class Rates Between Stations in Louisiana, 33 I.C.C. 302, 303 (1915); Harger & Blish v. Chicago, Milwaukee & St. Paul Ry. Co., 139 I.C.C. 128, 130 (1928); Vulcan Detinning Co. v. New York Central R. Co., 203 I.C.C. 260, 261 (1934); South Carolina Produce Ass'n v. Atlantic Coast Line R. Co., 209 I.C.C. 361, 363 (1935). The rule applies, therefore, that where provisions of one statute have been adopted by another, the interpretation which has been authoritatively placed upon the former applies to the latter also. See United States v. Ryan, 284 U.S. 167, 175, 52 S.Ct. 65, 76 L.Ed. 224; Armstrong Paint & Varnish Works v. Nu-Enamel Corporation, 305 U. S. 315, 332, 59 S.Ct. 191, 83 L.Ed. 195; I. C. C. v. Parker, 326 U.S. 60, 65, 65 S.Ct. 1490, 89 L.Ed. 2051; United States v. C.

in the Federal Power Act, sec. 205(e), 16 U.S.C.A. § 824d(e); and no different

interpretation has been placed upon it there.

I. O. 335 U.S. 106, 112–113, 68 S.Ct. 1349, 92 L.Ed. 1849; 50 Am.Jur. p. 461.

Not only did Hope place this construction upon the suspension provision of the act here in question, when shortly after the institution of the proceeding before the Commission it made the motion to put the rates into effect on the ground that otherwise a permanent loss of income would result, but its counsel, in the hearings on the bill which became the Natural Gas Act objected to an increase of from five to twelve months in the suspension period on the same ground, saying:

" * * * when the company thinks that it needs it (relief), if it can make certain within a period of 5 months some sort of a showing, it ought not to be put off longer than that, because it has no recourse under this particular section to go back and get reimbursed for that 12 months during which it has been collecting less than a fair and reasonable rate." Hearing House Committee on Interstate and Foreign Commerce, on H.R. 4008 (which as H.R. 6586 became the Natural Gas Act), 75th Cong., 1st Sess., pp. 45–46, 130–131.

It is argued that since the rates allowed by the Commission were found to be reasonable with reference to a test year which ended just before the beginning of the suspension period, there is as much reason in making the rates applicable during the suspension period as during the following period when the rates which had been suspended were in effect. This however, was a matter for Congress and not for the Commission or the courts. As pointed out above, Congress might have provided for the increased rates to become effective at once upon the giving of bond for the refund of any portion found to be unreasonable. It preferred, however, to adopt the method which had been found to work satisfactorily in railroad rate regulation and to make no provision for the collection of increased rates during the period of suspension. In the case of ordinary public service corporations, it would manifestly be a matter of great difficulty to collect any increase over rates which had been charged

and paid on a different basis. The case of furnishing gas at wholesale to other companies which deal with consumers presents the same difficulty in different form; for these retail dealers must base their rates upon the rates paid the wholesaler, and, if required to pay an increased rate for the suspension period, they would ordinarily have great difficulty in passing this increase on to their customers. The fact that the retail dealers here, four of whom are affiliated with Hope, are willing to pay the increased price for the suspension period is not a matter which throws any light upon the intention of Congress in passing the act or the proper interpretation to be given it.

It is argued that the constitutional guaranty against the enforcement of rates that are confiscatory requires that rates found reasonable be applied to the period of suspension. We do not think so. It has never been so held with respect to railroad rates, and there is no reason why any different principle should apply in the case of gas rates. The holding that certain rates may be allowed as reasonable does not mean that lower rates must be condemned as unreasonable and confiscatory, especially where they are continued in preservation of the status quo during a reasonable period of rate investigation. With changes in economic conditions rates must be changed from time to time, and the lag which necessarily accompanies the making of changes may result to the benefit of the utility as well as to its detriment. In the case of Hope it appears that while the former proceeding in which rates were reduced by the Commission was pending, Hope's rates were excessive by $920,029 for the period from June 30 to December 31, 1939, by $4,210,154 for the year 1940 and by $3,609,857 for the period from January 1941 to May 1942. See Re: Hope Natural Gas Co., 3 F.P.C. at 187, 201. It should be noted also that Hope's annual reports show that it received an overall return on its net investment rate base of 8.22 per cent for 1945 and 7.37 per cent for 1946, which means that for 1945 it received $981,353 in excess of a 6 per cent return and for 1945, $667,561. For the

years 1942, 1943 and 1944 the percentage of return is said to have been greater. See Re: Hope Natural Gas Co. 3 F.P.C. 150, 155. Rate making is not an exact science and losses of one period must be counterbalanced against gains of another in any fair consideration of the reasonableness of the rate making procedure.

It is true, of course, that a utility is entitled to rates that are just and reasonable; but this is not to say that rates must fluctuate automatically with every change in economic conditions or that a reasonable time may not be allowed for determining the reasonableness of a proposed increase in rates before it is allowed to go into effect. Any loss sustained by a maintenance of the status quo while such determination is being made is properly considered, not as a violation of constitutional right, but as a necessary incident of rate regulation so long as the period of suspension does not "overpass the bounds of reason." See American Telephone & Telegraph Co. v. United States, 299 U.S. 232, 247, 57 S.Ct. 170, 177, 81 L.Ed. 142; Federal Power Commission v. East Ohio Gas Co., 338 U.S. 464, 475, 70 S.Ct. 266, 94 L.Ed. 268. It is not contended, nor could it reasonably be, that the five months suspension period allowed by the statute is so unreasonable as to amount to a denial of due process. As pointed out by Senator Elkins with respect to the suspension provision of the Mann-Elkins Act, a limited period of suspension pending an investigation of proposed increases is "a reasonable limitation upon the exercise of the property rights of the carrier (utility) in fixing a rate." 45 Cong. Record 3472.

There is no contention that the Commission abused its discretion in suspending the rates filed nor request that we review the finding that these rates were unreasonable. Even if the order suspending them were invalid for any reason, it would not follow that other rates later found reasonable could be made retroactive because of its invalidity.

Hope relies particularly upon Transcontinental & Western Air, Inc., v. Civil Aeronautics Board, 336 U.S. 601, 69 S.Ct. 756, 757, 93 L.Ed. 911, and United States v. New York Central Railroad, 279 U.S. 73, 49 S.Ct. 260, 73 L.Ed. 619. Neither of these cases is in point. The Transcontinental & Western case involved, not ordinary rate making under such a provision as 4(e) with which we are dealing, but the fixing of rates for the carrying of mail for the government with express power "to make such rates effective from such date as it shall determine to be proper * * *." The case of United States v. New York Central Railroad likewise involved the determination of reasonable compensation for carrying the mail and had nothing to do with suspending rates or making other rates operative during the period of suspension.

For the reasons stated, the petition to modify the Commission's order will be denied and the order will be affirmed.

Affirmed.