**BELCO PETROLEUM CORPORATION, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

No. 77–1416.

United States Court of Appeals, District of Columbia Circuit.

Argued March 30, 1978.

Decided Nov. 15, 1978.

As Amended Dec. 14, 1978.

Judy M. Johnson, Oakland, Cal., with whom J. Evans Attwell, Houston, Tex., was on the brief, for petitioner.

Steven A. Taube, Atty., Federal Energy Regulatory Commission, Washington, D. C., with whom Philip R. Telleen, Atty., Federal Energy Regulatory Commission, Washington, D. C., on the brief, for respondent.

Before LUMBARD,\* Senior Circuit Judge for the United States Court of Appeals for the Second Circuit, and MacKINNON and WILKEY, Circuit Judges.

Opinion for the court filed by MacKINNON, Circuit Judge.

MacKINNON, Circuit Judge:

Section 4(e) of the Natural Gas Act, 15 U.S.C. § 717(c)(e) (1976), gives the Federal Energy Regulatory Commission (Commission) discretionary power over the suspension of rates and the ordering of refunds:

> Whenever [a new rate] is filed the Commission shall have authority . . to enter upon a hearing concerning the lawfulness of such rate, . . . and, pending such hearing and the decision thereon, the Commission . . . may suspend the operation of such schedule and defer the use of such rate, . . . but not for a longer period than five months beyond the time when it would otherwise go into effect . . . .. If the proceeding has not been concluded and an order made at the expiration of the suspension period, on motion of the natural-gas company making the filing, the proposed change of rate . . . shall go into effect. Where increased rates . . are thus made effective, the Commission may . . . require the natural-gas company . . . to refund, with interest, the portion of such increased rates or charges by its decision found not justified.

■ It is well established that a natural gas company cannot recoup income denied to it when the Commission exercises the five-month suspension power under section 4(e). *FPC v. Tennessee Gas Transmission Co.,* 371 U.S. 145, 152, 83 S.Ct. 211, 9 L.Ed.2d 199 (1962); *Hope Natural Gas Co. v. FPC,* 196 F.2d 803, 805–06 (4th Cir. 1952).

It is equally well settled that, notwithstanding the mutual agreement of the parties, a rate increase may not be made retroactively effective to cover the period of suspension. *Shell Oil Co. v. FPC,* 334 F.2d 1002, 1009 (3d Cir. 1964); *Hope Natural Gas Co. v. FPC, supra* at 807. It is in this background that we consider the issue presented in this case, namely, whether the petitioner should be permitted to offset the amount of increase income denied to it (when the Commission suspended the rate increase pursuant to section 4(e)) against its refund liability arising from the collection of the excessive rates following the expiration of the suspension period and before the legality of the rate was determined by the Commission.

## I

Petitioner Belco Petroleum Corporation (Belco) makes interstate sales of natural gas obtained from its leasehold interests in the Big Piney Area of Wyoming. These sales are made to Northwest Pipeline Corporation (Northwest) pursuant to five separate contracts negotiated in the late 1950's and on file with the Commission as Belco's Gas Rate Schedule Nos. 1, 2, 3, 5, and 6. On August 6, 1974, Belco and Northwest agreed to amend these contracts to increase the applicable prices to forty cents (40¢) per Mcf.[1] The next day, Belco tendered the proposed rate increases for filing with the Commission. On September 6, 1974, the Commission accepted Belco's filings and, invoking its power under section 4(e), suspended the effectiveness of the proposed rates for five months until February 7, 1975. Under the provisions of section 4(e), if the Commission has not passed on the lawfulness of the rates, the higher rate goes into effect at the end of the suspension period.

Adjusted for pressure base differential, tax reimbursement, and Btu content, the 1974 amendment price was 41.72¢ per Mcf. In consideration for the 1974 increase, Belco undertook an extensive drilling and workover program on acreage covered by the subject contracts.

---

\* Sitting by designation pursuant to U.S.C. § 294(d).

1. The price for gas sold under Belco's Gas Rate Schedule Nos. 1, 2, and 3 was 21.16¢ per Mcf., subject to upward adjustment depending on the pressure at which the gas was delivered. The price for gas sold under Belco's Gas Rate Schedule Nos. 5 and 6 was 28.63¢ per Mcf.

Approximately fifteen months before the negotiation and filing of the Belco-Northwest rate increase, the Commission had issued notice of a proposed rulemaking to establish nationwide rates for natural gas obtained from wells commenced prior to January 1, 1973.[2] This rulemaking would affect most of the gas sold under the Belco-Northwest contracts. The rulemaking proceedings did not culminate in a final determination until December 31, 1975, over ten months after Belco's increases went into effect. On that date, the Commission issued Opinion No. 749, setting the just and reasonable rate for natural gas from the subject wells.[3] Opinion No. 749 also provided that for sales (such as Belco's) being made subject to refund, the newly established rate "shall be the applicable just and reasonable rate as of the date of suspension" and that "all amounts collected in excess of that rate shall be refunded." The Commission later revised the refund procedure, however, in Opinion No. 749–C, issued July 19, 1976. This second opinion provided that the newly established rates would apply from the date such rates were collected subject to refund.

Belco duly filed its refund reports on November 16, 1976, but in so doing, it reduced the amounts it had collected in excess of the applicable just and reasonable rate by the difference between the amounts it had been able to collect during the suspension period and the amounts it could have collected under the newly established rates had there been no suspension. By letter order dated January 11, 1977, the Commission rejected Belco's proposed offset procedure, declaring it to be "improper and inconsistent with Commission precedent." On March 10, 1977, the Commission issued an order denying Belco's application for rehearing and reaffirming its rejection of the offset procedure, but it subsequently granted Belco's request for a stay pending appeal. Belco's petition before this court seeks review of the orders of January 11 and March 10, 1977.

**2.** 38 Fed.Reg. 22848 (1973).

**3.** The Commission set a base ceiling price of 23.5¢ per Mcf. on and after July 1, 1976. These

## II

As a preliminary issue, the Commission contests Belco's standing in this court. Section 19(b) of the Natural Gas Act, 15 U.S.C. § 717r(b) (1976), requires a reviewing court to consider only objections that have been urged before the Commission in an application for rehearing. The Commission asserts that the application for rehearing did not contain an objection to the Commission's order based on Belco's interpretation of Opinion No. 749, and that consequently this court should not address that issue.

Belco's application for rehearing set forth arguments in support of its contention that the Commission abused its discretion in rejecting Belco's requested offset procedure, which had been based on Opinion No. 749. Section 19 does not preclude appellate consideration of an argument in support of a properly preserved ground of error. Read in the entirety, Belco's application gave notice to the Commission with sufficient clarity regarding the grounds on which it urged reconsideration. This fulfills the statutory requirement. *See Rhode Island Consumers' Council v. FPC,* 164 U.S. App.D.C. 134, 143, 504 F.2d 203, 212 (1974). Accordingly, we find standing.

## III

The language of Opinion No. 749 relevant to refund obligations provided:

> For those sales which are presently being made subject to refund, we find that the rate established in this Opinion or the higher applicable rate, *shall be the applicable just and reasonable rate as of the date of suspension* and *all* amounts *collected* in excess of that rate, as adjusted pursuant to the regulations adopted herein, or the higher applicable area rate shall be refunded . . . .

(Emphasis added).

Belco argues that this language authorized it to offset its refund obligations by the income denied during the period of suspension when it could not collect a just and

rates were subject to adjustment for, *inter alia,* Btu content, taxes, and gathering.

reasonable rate. Belco emphasizes that it was *contractually* entitled to collect the just and reasonable rate from the date of suspension but could not do solely because the Commission exercised its valid authority under section 4(e).[4]

Although Belco's argument has some facial validity, the language of Opinion No. 749, read in its entirety, is not unequivocal in support of Belco's position. Instead, the language is quite ambiguous with respect to the manner of computing the refund. For example, another explanation for the above-quoted language—and in our view the more plausible one—is that the Commission, in stating that the "applicable just and reasonable rate" shall exist "as of the date of suspension," was simply acknowledging that the filed rate had been investigated and found to be just and reasonable as of the time the investigation began or as of the date the rate would have become effective absent suspension. The separate and distinct character of the two considerations involved in Opinion No. 749—what is the just and reasonable rate, and the manner in which the refund is to be computed— is apparent from the text of the preceding paragraph of the Opinion:

> At the present time, there are a number of jurisdictional sales, which will be subject to the rate prescribed herein, that are being made subject to refund. By this decision, we [(1)] determine a just and reasonable rate for those sales and [(2)] require refunds of amounts collected which are in excess of the applicable rate.

Thus, the just and reasonable rate was first determined as of the date of suspension (which is the usual reference point from which such a determination is made), *and then* a statement was made concerning the refunds. The reference to the "date of suspension," a phrase modifying the "applicable just and reasonable rate," has, in logic, nothing to do with the Commission's statement about the computation of refunds.

In stating that "all amounts collected in excess of that rate . . . shall be re-funded," therefore, the Commission was embarking on the discussion of a new subject. In so stating, the Commission could well have meant that *all* monies *collected* as a result of the higher, excessive rate—that is, the rate charged during the period between the end of the suspension period and the final determination of the just and reasonable rate—should be returned to the company's customers. On this reading, in other words, the Commission intended the refund computation to be made by looking only to the period during which the higher rate was *actually collected,* a period which does *not* include the period of suspension.

It must be conceded, however, that Belco's interpretation of the language of Opinion No. 749 is not wholly unreasonable if one looks solely to the language. Although the Commission may well have intended to refer only to the period during which a higher rate was actually collected, the language of the Opinion itself does not foreclose computing the "excess" by incorporating the period of suspension.

Fortunately, the Commission clarified this ambiguity in its subsequent order of July 19, 1976, Opinion No. 749–C. This order provided:

> [R]efunds shall be computed on the basis of the adjusted national rate or the otherwise applicable area rate, whichever is greater. *Such rates shall apply from the date rates were collected subject to refund* . . . .

(Emphasis added). The order also provided:

> For those proceedings in which rates are presently being collected subject to refund or were collected subject to refund prior to the issuance of Opinion No. 749, *refunds will be determined on the basis of the adjusted national rate prescribed in Opinion No. 749* or the otherwise applicable higher area rate.

(Emphasis added). This language clarified the ambiguity created by the imprecise language in Opinion No. 749. Opinion No. 749–C makes clear that the refunds were to be computed *without* reference to what

---

4. *See* note 10 *infra.*

could have been collected during the period of suspension. Indeed, the second of the above-quoted passages strongly suggests that all Opinion No. 749 sought to accomplish by referring to the "date of suspension" was to demonstrate that the approved rate was "just and reasonable" on the factual showing as of that date, but not that refunds were to be computed by including a backward adjustment for the period of suspension. The clarification in Opinion No. 749–C indicates, moreover, that the reference to "amounts collected" in Opinion No. 749 was intended to limit the refund computation to the period after the lapse of the suspension, that is, to the period when "amounts" were *actually* "collected."

Indeed, a detailed examination of Opinion No. 749–C strongly suggests that Opinion No. 749 was *never* intended to permit Belco's proposed offset procedure. The reference to "the applicable just and reasonable rate as of the date of suspension" was contained in the text of Opinion No. 749 in a section entitled "Refunds and Rate Increases." The procedure for computing the refund was set forth in more specific terms in Ordering Paragraph (D), which provided:

(D) *Producer Refunds and Purchaser's Flow-Through*

Within 120 days of the date of this order, refund reports shall be filed with this Commission in triplicate, and one copy served on the purchaser, by each *producer* (other than small producers) *collecting rates* subject to refund in Section 4(e) or Section 7(c) proceedings in excess of the adjusted national rate prescribed herein or the otherwise higher applicable area rate, and as to which refunds are required under the terms of this decision.

(Emphasis added). This paragraph, which articulates the procedure for paying refunds, makes no reference to the period of suspension. This paragraph, like the passage from the same order analyzed above, is ambiguous: the period for computing the "excess of the adjusted national rate" could be confined solely to the period after the suspension period when rates were actually collected, or it could be that period as well as the period of suspension. The language

from Opinion No. 749–C quoted above was specifically designated as amending Ordering Paragraph (D) of Opinion No. 749. As we noted, that language from Opinion No. 749–C makes no reference to the period of suspension. This omission suggests to us that the Commission never meant to refer to the period of suspension in computing the refund and that Opinion No. 749–C was meant to clarify an ambiguity in the earlier order to prevent an interpretation permitting an offset procedure.

There is an additional reason strongly suggesting that Opinion No. 749 was never intended to allow the offset procedure urged by Belco. In *FPC v. Tennessee Gas Transmission Co., supra,* the Court stated that a company "can *never* recoup the income lost when the five-month suspension power of the Commission is exercised under § 4(e)." 371 U.S. at 152, 83 S.Ct. at 215 (emphasis added). This is a clear statement of regulatory philosophy, one which has been religiously followed by the Commission. Had the Commission intended to shift its regulatory approach with Opinion No. 749, it surely would have done so with less ambiguous language than that found in the opinion. *See Gillring Oil Co. v. FERC,* 566 F.2d 1323, 1325 (5th Cir. 1978).

In any event, Opinion No. 749–C clearly and unambiguously clarified the language of Opinion No. 749. When construction of an agency regulation is in issue, courts owe great deference to the interpretation adopted by the agency and will uphold that interpretation if it is reasonable and consistent with the regulation. The court need not find that the agency's construction is the only possible one, or even the one that the court would have adopted in the first instance. *United States v. Larionoff,* 431 U.S. 864, 872, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977); *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *Bowles v. Seminole Rock Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945); *Leefer v. Administrator, NASA,* 177 U.S.App.D.C. 62, 66, 543 F.2d 209, 213. Consistent with this principle, a court

should enforce the language in a subsequent, clear regulation, if otherwise reasonable and valid, instead of that in a prior, ambiguous regulation.[5] This case is not an example of an agency reversing itself without adequate explanation.[6] Rather, the Commission here discerned an ambiguity in its initial order and it acted to correct that ambiguity in clear and precise terms. In such a circumstance, enforcement of the clarifying language is wholly appropriate. *Chesapeake & Ohio Ry. Co. v. ICC,* 187 U.S.App.D.C. 241, 245, 571 F.2d 1190, 1194 (1977).[7] In short, the Commission's action may not have been "tidy, but it was not arbitrary or capricious." *Id.*

## IV

■ Our inquiry does not end with the conclusion that the Commission did not act arbitrarily or capriciously in clarifying the ambiguity of Opinion No. 749. The question remains whether Belco has a right to offset its refund obligation by the amount of income denied it during the suspension period. Stated differently, the issue is whether depriving Belco of the offset deprives it of income to which it is entitled on

statutory or constitutional grounds. We hold that it does *not.*

## A

■ Nothing in section 4(e) requires the Commission to order refunds. The Commission *may* order refunds, but the decision is left to the Commission's discretion. *Cities Service Gas Co. v. FPC,* 175 U.S.App.D.C. 316, 328, 535 F.2d 1278, 1290 (1976); *Placid Oil Co. v. FPC,* 483 F.2d 880, 905 (5th Cir. 1973), aff'd sub nom. *Mobil Oil Corp. v. FPC,* 417 U.S. 283, 94 S.Ct. 2328, 41 L.Ed.2d 72 (1974); *In re Hugoton-Anadarko Area Rate Case,* 466 F.2d 974, 990 (9th Cir. 1972). In granting the Commission that discretion, Congress did not specify how the refunds should be computed; this, too, was left to the discretion of the agency.[8] Furthermore, the statute does not give a company filing a rate under section 4(d) the right to collect the just and reasonable rate throughout the period of suspension when the Commission invokes its power under section 4(e). Had Congress so intended, it could easily have inserted the appropriate language into the statute.[9] Nor does the

---

**5.** As then Circuit Judge (later Justice) Minton wrote in *Barron Coop. Creamery v. Wickard,* 140 F.2d 485, 488 (7th Cir. 1944):

> Administrative orders, like statutes, are not to be given strained and unnatural constructions. As was said in *Lynch v. Alworth-Stephens Co.,* 267 U.S. 364, 370, 45 S.Ct. 274, 276, 69 L.Ed. 660 . . .: "the plain, obvious and rational meaning of a statute is always to be preferred to any curious, narrow, hidden sense that nothing but the exigency of a hard case and the ingenuity and study of an acute and powerful intellect would discover." The language of a regulation should be considered as intended to guide and not to entrap those who are governed by it.

**6.** Belco argues that it is impossible to determine the basis for the Commission's action in this case. While the Commission's letter order, Joint App. at 1, and the order denying rehearing, *id.* at 12–15, are quite succinct, the discussion therein and the citation of cases do communicate the manner in which the Commission reasoned and consequently do demonstrate the basis for the Commission's action.

**7.** In *Chesapeake & Ohio Ry. Co. v. ICC,* 187 U.S.App.D.C. 241, 571 F.2d 1190 (1977), a panel of this court enforced an ICC modification of an earlier order on the ground that a clarifica-

tion was justified by an ambiguity. All judges agreed that a subsequent *clarifying* order should control. The dissent's objection was that the earlier order did not contain an ambiguity and thus the subsequent order worked a substantive change. *Id.* at 255, 571 F.2d at 1204 (MacKinnon, J., dissenting). The order in this case clearly does contain an ambiguity.

**8.** *Cf. Tenneco Oil Co. v. FERC,* 571 F.2d 834, 840 (5th Cir. 1978) (the Natural Gas Act permits Commission to take replacement cost into account in formulating rates).

**9.** As the court of appeals said in *Hope Natural Gas Co. v. FPC,* 196 F.2d 803, 806 (4th Cir. 1952):

> Some states provide for putting a suspended rate into effect immediately by filing a bond for the repayment of any excess found. [Statutory citations omitted.] No such provision was inserted in the statute here under consideration. It is argued that it is as reasonable to make the rates retroactive to the beginning of the suspension period as to the end thereof. The answer is that Congress made express provision for the refund of the excess portion of rates collected after the expiration of the suspension period but made no provision whatever for collecting any additional amount for the period of suspension.

statute give the producer the right either to offset with illegally accumulated funds the income denied during the suspension (or any other) period, or to offset such denied income against refund obligations. Because the statute does not give the company a right to the just and reasonable rate during the period of suspension, and because the statute does not affirmatively grant the right to an offset, the Commission, in the proper exercise of its broad discretion, did not deny Belco any right to which it was entitled under the Natural Gas Act.

It is not insignificant that the Commission acted consistently with the statutory bias favoring retroactive rate reductions but not retroactive rate increases, a bias Congress wrote directly into the statute:

[T]he Commission shall have no power to order any increase in any rate contained in the currently effective schedule of such natural gas company on file with the Commission, unless such increase is in accordance with a new schedule filed by such natural gas company; but the Commission may order a decrease where existing rates are unjust, unduly discriminatory, preferential, otherwise unlawful, or are not the lowest reasonable rates.

15 U.S.C. § 717d(a) (1976). While the offset Belco proposes is not technically a retroactive rate increase, it is a retroactive assessment against the consumer and would have the same effect as a retroactive rate increase. Regardless of how the offset is characterized, rates the consumer did not pay during the suspension period would be charged against them, albeit camouflaged as reductions in the payments Belco must make for having charged above a just and reasonable rate after the suspension period lapsed. The conclusion is inevitable, then, that in denying Belco's request for an offset, the Commission neither violated the statute nor deprived Belco of any right to which it was entitled under the statute. *See Gillring Oil Co. v. FERC, supra* at 1325.

### B

The constitutional implications of natural gas regulation were addressed in *Permian*

*Basin Area Rate Cases,* 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968), in which producers of natural gas challenged the validity of the FPC's initiation of area rate regulation. One argument advanced by the producers was that the system of area regulation exceeded the Commission's constitutional and statutory authority. The Court responded:

It is plain that the Constitution does not forbid the imposition, in appropriate circumstances, of maximum prices upon commercial and other activities . . . .. Its exercise has regularly been approved by this Court . . . .. It is, however, plain that the "power to regulate is not a power to destroy," . . . and that maximum rates must be calculated for a regulated class in conformity with the pertinent constitutional limitations. Price control is "*unconstitutional . . if arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt . . .." Nebbia v. New York,* 291 U.S. 502, 539 [54 S.Ct. 505, 517, 78 L.Ed. 940]. Nonetheless, *the just and reasonable standard of the Natural Gas Act "coincides" with the applicable constitutional standards, FPC v. Natural Gas Pipeline Co.,* [315 U.S. 575,] 586 [62 S.Ct. 743, 86 L.Ed. 1037], *and any rate selected by the Commission from the broad zone of reasonableness permitted by the Act cannot properly be attacked as confiscatory.* Accordingly, there can be no constitutional objection if the Commission, in its calculation of rates, takes fully into account *the various interests which Congress has required it to reconcile.* We do not suggest that maximum rates computed for a group or geographical area can never be confiscatory; we hold only that *any such rates, determined in conformity with the Natural Gas Act, and intended to "balanc*[e] . . . *the investor and the consumer interests," are constitutionally permissible. FPC v. Hope Natural Gas Co.,* [320 U.S. 591,] 603 [64 S.Ct. at 288, 88 L.Ed. 333].

390 U.S. at 768–70, 88 S.Ct. at 1360–61 (emphasis added).

Insofar as it affects the producer, a decision by the Commission to approve a producer's filed rate at a just and reasonable level somewhere below the proposed rate is analytically the same as a decision by the Commission that a refund should be made. Both decisions impose a maximum price upon the producer; the difference is that one operates prospectively while the other operates retroactively. Consequently, like a rate decision, a refund order would be unconstitutional if "arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt." And a refund decision that falls within "the broad zone of reasonableness permitted by the Act" could not "properly be attacked as confiscatory." In sum, no constitutional objection will lie if the Commission fully accounts for "the various interests which Congress has required it to reconcile."

Similarly, a decision by the Commission to suspend the effectiveness of proposed rates—a decision which may operate permanently to deprive a natural gas producer of a just and reasonable rate [10]—is properly within the sound discretion of the Commission. Section 4(e) reflects the careful balancing of several interests. Obviously, an important purpose of the suspension power is to maintain the status quo for up to five months during which the Commission can investigate the reasonableness of the proposed rate. *Phillips Petroleum Co. v. FPC*, 227 F.2d 470, 474 (10th Cir. 1955), *cert. denied*, 350 U.S. 1005, 76 S.Ct. 649, 100

L.Ed. 868 (1956). Yet that is not its only purpose. A good example of the broader implication of section 4(e)'s suspension power is apparent in *Hunt Oil Co. v. FPC*, 398 F.2d 746 (5th Cir. 1968), in which four independent natural gas producers, parties to an area rate proceeding initiated under section 5(a), 15 U.S.C. § 717d(a) (1976), petitioned the court for review of the Commission's five-month suspension of their proposed rate increases. The court, in response to the petitioners' claim that the five-month suspensions were meaningless when no individual examination of the proposals was contemplated within that period, declared:

It is manifest that an area rate case requires more than five months to be completed by the Commission. However, it cannot be denied that the five-month period is being utilized by the Commission in its investigation and determination of the area rate. . . . The five month's suspension period is a congressional authorization provided by the Natural Gas Act and we are without authority to nullify it. Petitioners assert no constitutional invalidity in the practice but contend that the circumstances warrant a holding by us that the Commission's exercise of the five months' suspension period in the majority of independent producer filings, when an applicable area rate case is pending, is an abuse of discretion. We are unable to agree, for it is apparent that *Congress intended to protect consumers from increased rates until the Commission would fix just and reasonable rates, but it considered that a*

---

**10.** That it does so does not render § 4(e) constitutionally defective. *Hope Natural Gas Co. v. FPC*, 196 F.2d 803, 808 (4th Cir. 1952); *see FPC v. Tennessee Gas Transmission Co.*, 371 U.S. 145, 152–53, 83 S.Ct. 211, 9 L.Ed.2d 199 (1962). Nor is the fact that a producer may have a contract with the consumer relevant. It is true that a regulatory scheme of the Natural Gas Act is premised on contractual agreements voluntarily devised between producer and consumer; these contracts are abrogated only for public necessity. *Permian Basin Area Rate Cases*, 390 U.S. 747, 822, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968). Congress has concluded, however, that the public interest in protecting

consumers from unreasonable charges justifies suspending the operation of such rates, in the Commission's discretion, for up to five months from the date of filing. The policy concern is present regardless of whether the producer has a contract with the consumer. Indeed, it is well settled that the contract regulating the relationship between producer and consumer is distinct from the service the producer provides and that the contract may, at times, be subject to checks imposed by the regulatory scheme. *See Sunray Mid-Continent Oil Co. v. FPC*, 364 U.S. 137, 153, 80 S.Ct. 1392, 4 L.Ed.2d 1623 (1960).

*period of five months would be the maximum time permitted.*

398 F.2d at 749–50 (emphasis added).

As *Hunt Oil* illustrates, section 4(e) reflects a congressional balance of the consumer's interest in being protected from excessive rates and of the producer's interest in receiving some increase pending final Commission action in what can often be lengthy investigations. When the Commission suspends a rate, its action is expected to reflect an appropriate balance of these competing interests, thereby furthering the legislative intent. Presumably, if a suspension is not within the zone of reasonableness reflecting the appropriate balance of competing interests, it may be confiscatory and unconstitutional within the meaning of *Permian Basin*.[11] The permissible zone, however, is obviously extremely broad when suspension orders are being tested, for in that context Congress has seen fit by statute to afford the Commission considerable discretion.[12]

In testing the Commission's decision disallowing Belco to offset the income denied during the period of suspension against the refunds of the excessive rates charged in the post-suspension period, we hold that the Commission did not transgress the broad zone of reasonableness that marks the constitutional limits on Commission activity. The Commission has determined that such an offset is inconsistent with policies served by section 4(e)'s suspension power. These policies reflect, in our view, the careful balancing of competing interests, which Congress has directed the Commission to reconcile.[13]

11. This point is well made by the court of appeals in *Hope Natural Gas Co. v. FPC*, 196 F.2d 803, 809 (4th Cir. 1952):

Any loss sustained by a maintenance of the status quo [*i. e.*, by suspension] while such determination [of the reasonableness of a proposed rate increase] is being made is properly considered, not as a violation of a constitutional right, but as a necessary incident of rate regulation so long as the period of suspension does not "overpass the bounds of reason." See *American Telephone & Telegraph Co. v. United States*, 229 (299) U.S. 232, 247, 57 S.Ct. 170, 177, 81 L.Ed. 142 . . . .

12. Here again the reasoning of *Hope Natural Gas Co. v. FPC*, 196 F.2d 803 (4th Cir. 1952) is instructive:

It is argued that since the rates allowed by the Commission were found to be reasonable with reference to a test year which ended just before the beginning of the suspension period, there is as much reason in making the rates applicable during the following period when the rates which had been suspended were in effect. *This however, was a matter for Congress and not for the Commission or the courts.*

*Id.* at 808 (emphasis added).

13. [The following discussion is not concurred in by the other two members of this panel.]

An example of the application of policies underlying the Commission's exercise of discretion under § 4(e) is illustrated by the considerations suggested by the facts of this case.

A producer who files a proposed rate that is subsequently adjudged by the Commission to be a just and reasonable rate is nonetheless deprived of that rate during the suspension period that the Commission invokes in the exercise of its § 4(e) power. Owing to the likelihood that the Commission will order a refund if a proposed rate is in excess of the just and reasonable rate, a producer now stands to gain very little from filing a rate he believes to be outside the zone of reasonableness. A producer may, of course, file a rate he knows to be somewhat higher than the Commission is likely to approve, but such a decision at the present time is probably prompted by the not inconceivable chance that within the very broad range of reasonableness the Commission will approve a rate on the higher end of the zone. A just and reasonable rate is not a product of any single formula, but is instead a rate within a broad ambit of various rates which may be just and reasonable See, e. g., *Permian Basin Area Rate Cases*, 390 U.S. 747, 767, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968); *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 602, 64 S.Ct. 281, 88 L.Ed. 333 (1944); *FPC v. Natural Gas Pipeline Co.*, 315 U.S. 575, 585–86, 62 S.Ct. 736, 86 L.Ed. 1037 (1942). Thus, any current tendency to propose a somewhat higher rate is more a function of a strategically-based hope for a higher legitimate return than a rationally-based expectation of future *illegitimate* gain. If, however, a producer were permitted to offset the income denied him during the suspension period against his refund obligation, the producer would then have an incentive to file a rate in excess of what he knows is a just and reasonable rate *because* of a rationally-based expectation of future illegitimate gain. That is, if the Commission's investigation of the proposed rate lasts longer than the suspension period (a not uncommon occurrence), then the producer would be allowed to collect the unreasonable rate and divert some of it to his own use, knowing that he will be able to offset some of

The Commission's responsibility is to "afford consumers a complete, permanent, and effective bond of protection from excessive rates and charges." *Atlantic Refining Co. v. Public Service Commission*, 360 U.S. 378, 388, 79 S.Ct. 1246, 1253, 3 L.Ed.2d 1312 (1959); *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 612, 64 S.Ct. 281, 88 L.Ed. 333 (1944); *Cities Service Gas Co. v. FPC*, 424 F.2d 411, 417 (10th Cir. 1969), *petition for cert. dismissed*, 400 U.S. 801, 91 S.Ct. 400, 27 L.Ed.2d 33 (1970). As the court of appeals recognized in *Hunt Oil*, one of the purposes of the suspension period is "to protect consumers from increased rates until the Commission would fix just and reasonable rates." 398 F.2d at 750. This goal exists independently of the refund possibility. Belco's suggestion that consumers will not suffer from the refund offset is belied by the manner of computation itself. As we noted earlier, rates that the consumer did not pay during the suspension period

are charged against them as reductions of the refunds Belco must make for having charged users more than the just and reasonable rate in the post-suspension period. This situation is quite similar to that in *Gillring Oil Co. v. FERC, supra*, in which the court upheld the Commission's denial of petitioner's request to offset the refunds it was ordered to pay for charging prices in excess of ceiling prices in other years. Petitioner argued that the consumer would not be injured from the refund offset because charging ceiling prices in all years would have been reasonable. The court rejected that argument, stating that it "defies plain arithmetic, ignores the ceiling rate concept, and flaunts [sic] the filed rate doctrine." 566 F.2d at 1326.[14]

### C

Our research and that of counsel have not uncovered any decisions directly addressing the issue of this case. The case law does,

---

this excess against income denied him during the suspension period.

Allowing an offset, as Belco requests, would tend to encourage unreasonably high filings with an eye toward generating a fund with which suspension period rates could, in effect, be increased, thereby diminishing or eliminating altogether the refund due consumers. The Commission could reduce or avoid this tendency by exercising its option to suspend for one day only. But while this might reduce the incentive to file excessive rates, it would place a burden on the Commission's exercise of its discretion and sacrifice the additional consumer interest, evident in the *Hunt Oil* analysis above, in being free from increased rates for the maximum allowable period while the Commission is considering the validity of the increase. Congress has determined that the risk of harm to the public of paying excessive rates—absent the additional incentives to file such rates inherent in an offset procedure—justifies the use of a five month suspension period. This delicate balance would be disrupted if producers were encouraged to file excessive rates, or alternatively, if consumers are denied the protection of an up-to-five-month suspension period.

Of course, the offset procedure proposed by Belco would not impact consumers in the same manner as a pure retroactive increase. *See Indiana & Michigan Elec. Co. v. FPC*, 163 U.S. App.D.C. 334, 336, 502 F.2d 336, 344 (1974), *cert. denied*, 420 U.S. 946, 95 S.Ct. 1326, 43 L.Ed.2d 424 (1975). Belco's procedure would not require customers to make direct payments

to Belco. It would, however, reduce the refund payment to consumers, a refund prompted by the imposition of an illegal rate on those customers. This impact would no doubt be less than that incurred by the customers in *Indiana & Michigan Electric*, but the disruption to a balanced regulatory scheme would still be significant simply because an offset procedure would force the Commission to sacrifice one or the other of the public interests served by the *suspension power*.

14. *Gillring's* offset procedure can be factually distinguished from that proposed by Belco. In the years that Gillring's prices were below the ceiling prices, the Commission was not restricting the upward movement of the prices in any way. Rather, the price was that voluntarily devised by the regulated companies, disturbance of which is not countenanced unless demanded by public necessity. 566 F.2d at 1324; *see Permian Basin Area Rate Cases*, 390 U.S. 747, 822, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968). In this case, the bargain of the parties, which will not be disturbed unless harmful to the consumers, was suspended for five months and Belco seeks an indirect reparation for its inability to collect its increased rate during that period. The *distinction*, however, *does not alter* the fact that the offset procedure in both cases "defies plain arithmetic" and flouts "the filed rate doctrine."

An offset procedure similar to the one proposed in *Gillring* was also rejected in *Phillips Petroleum Co.*, 41 F.P.C. 415, 417 (1969).

however, provide some guidance in resolving the issue.

In *Permian Basin Area Rate Cases, supra,* the Supreme Court considered whether the Commission's power to order refunds was limited to periods in which aggregate revenues for all producers in a given area exceeded aggregate revenue requirements for such producers. In holding that the Commission's power was not so limited, the Court stated:

> A rate found to be unjust and unreasonable is declared by § 4(a) to be unlawful; if the rate has been the subject of a rate schedule modification under § 4(d), the Commission is empowered by § 4(e) to order its refund. *We can see no warrant, either in the Act or in the terms of the Commission's orders, now to impose any additional limitations upon the Commission's authority* . . . .

390 U.S. at 827, 88 S.Ct. at 1391 (emphasis added). There are, as Belco asserts, factual distinctions between this case and *Permian Basin* : the latter involved many producers while this case presents one producer with identifiable contract commitments. Yet the similarities between the two cases are striking, particularly in the reasoned path that the Commission followed in each case. The *Permian Basin* Court said that the Commission

> reasonably concluded that the adoption of a system of refunds conditioned on findings as to aggregate area revenues . . . would require consumers to accede to unjust and unreasonable prices merely because other prices . . . had proved improvident.

390 U.S. at 828, 88 S.Ct. at 1392. Here, the Commission apparently reasoned that the offset procedure was unreasonable, for it could cause consumers to accede to unjust and unreasonable prices in a period between the lapse of the suspension period and the conclusion of the investigation. Moreover, the Commission had a reasonable concern that producers not be enticed to seek rates far in excess of the just and reasonable level in order to create a fund against which retroactive rates could be offset.

Like the *Permian Basin* Court, we find no reason "now to impose any additional limitations upon the Commission's authority."

Similarly, the reasoning in *FPC v. Tennessee Gas Transmission Co., supra,* tends to support the Commission's decision in this case. Tennessee Gas operated an extensive pipeline system, which it divided into six rate zones with rate differentials. It did not have a system-wide rate applicable to all services. In 1959, Tennessee Gas filed with the Commission proposed rate increases for its six rate zones. The proposed rates were based on a 7% overall return on its net investment. At the outset of the hearings on the reasonableness of the proposed rates, the Commission imposed a five month suspension period. After a full hearing, the Commission concluded that 6⅛% rather than 7% was a just and reasonable return. Accordingly, it ordered Tennessee Gas to file lower rates retroactive to the end of the five-month suspension period and to refund the differences collected since that time. Tennessee Gas did not object to the 6⅛% figure for return on net investment, but it did contend that requiring refunds prior to a determination on cost allocation among its zones of operation might result in its being unable to realize the just and reasonable return during the refund period. Tennessee Gas reasoned that in some of the zones the approved rates might exceed the collected rates less the refunds ordered, with the result that it would be unable to achieve a 6⅛% return because it could not retroactively collect the higher rate in those zones while it was obligated to make full refunds in the remaining lower rate zones. On review, the court of appeals held that the Commission erred in ordering an immediate refund before it had determined other issues in the proceeding, particularly the proper allocation costs among the six zones, an issue that could well determine the reasonableness of the overall filed rate with respect to each zone. The Supreme Court reversed the court of appeals:

> [A]n analysis of the policy of the [Natural Gas] Act clearly indicates that a natural gas company initiating an increase in rates under § 4(d) *assumes the hazards*

*involved in that procedure. . . . [T]he company can never recoup the income lost when the five-month suspension power of the Commission is exercised under § 4(e).* The company is also required to refund any sums thereafter collected should it not sustain its burden of proving the reasonableness of an increased rate, and it may suffer further loss when the Commission upon a finding of excessiveness makes adjustments in the rate detail of the company's filing. *In this latter respect a rate for one class or zone of customers may be found by the Commission to be too low, but the company cannot recoup its losses by making retroactive the higher rate subsequently allowed;* on the other hand, when another class or zone of customers is found to be subjected to excessive rates and a lowered rate is ordered, the company must make refunds to them. The company's losses in the first instance do not justify its illegal gain in the latter. . . . The company having initially filed the rates and either collected an illegal return or failed to collect a sufficient one must, under the theory of the Act, *shoulder the hazards incident to its action including not only the refund of any illegal gain but also its losses where its filed rate is found to be inadequate.*

371 U.S. at 152–53, 83 S.Ct. at 215 (emphasis added).

Thus, that a higher rate might be declared just and reasonable in one of the zones did not entitle Tennessee Gas, in effect, to offset the income denied in that zone against the refunds ordered in another zone. Here again, *Tennessee Gas* can be factually distinguished from this case: the petitioner in the former did not seek to offset income denied during the suspension period against the ordered refunds. Yet the principle underlying the case—that a company cannot recoup its losses by imposing a retroactive assessment on its customers—is equally applicable here. The Court's statement that a company "can *never* recoup the income lost when the five-month suspension power of the Commission is exercised" reflects, as we have said, a regula-

tory philosophy that has served both to further, within constitutional limits, the interests which the Act is intended to protect, and to reconcile other competing interests. It was proper for the Commission to insist that Belco both "refund [its] illegal gain" and shoulder "its losses," which were "incident to its actions."

Perhaps the most important implication of *Tennessee Gas* and *Permian Basin* is that no precedent *forbids* the Commission from following the course it has taken. In the reported cases, the Commission has resisted off-setting refunds with prior losses, for such procedures have often closely resembled retroactive ratemaking. But the interests to be furthered by the Act also justify prohibitions on other kinds of retroactive assessments like the one Belco would impose here. It is not the province of this court to substitute its judgment for that of the Commission. *See Humbolt Express v. ICC*, 186 U.S.App.D.C. 141, 567 F.2d 1134, 1137 (1977). If the Commission's judgment is to be altered at all, it must offend one of the standards we use to test such judgments. The absence of specific precedent authorizing the Commission's conclusion is not troublesome when, as here, the philosophy of the decided cases is congruent with the path the Commission has followed.

## V

Accordingly, because the Commission did not act in an arbitrary and capricious manner in denying Belco's request, and because a contrary result is not mandated by the Constitution, the statute, and the philosophy underlying the relevant judicial precedent, we affirm.

*Judgment accordingly.*